Hilda Claire OAKS, Plaintiff,

v.

CITY OF FAIRHOPE, ALABAMA; The Board of Trustees of the Fairhope Public Library; James Nix; David Ed Bishop; Robert Mason; H. B. Shepherd; Henry G. Bishop; Samuel E. Box; Jack A. Stipes; Billy Don Wiggins; Trisha Nelson; and C. O. McCawley, Defendants.

Civ. A. No. 80–0393–H.

United States District Court,
S. D. Alabama, S. D.

May 20, 1981.

---

---

#

In considering the motion for summary judgment, this court may not adjudicate factual issues. This court's duty is to determine whether or not there is an issue of fact to be tried. *Hayden v. First National Bank of Mt. Pleasant,* 595 F.2d 994 (5th Cir. 1979). Voluminous discovery has been conducted in this action. Twelve depositions (with exhibits) have been filed with the court; additionally, several affidavits and documentary exhibits have been submitted in connection with the motion for summary judgment. In reviewing the record, this court has viewed the facts together with all inferences drawn from the facts in the light most favorable to Oaks (the party opposing summary judgment). *See Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); 6 *Moore's Federal Practice* ¶ 56.15[3] (2d ed. 1976). The court has fully heeded the admonition of the Supreme Court in *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977):

> [D]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.

Cognizant of the sensitive nature of Oaks' claims, the court has strictly adhered to the procedural requirements of summary judgment. This court may not, however, ignore the clear dictates of Rule 56, *Federal Rules of Civil Procedure.* No civil action is immune from summary adjudication. *See* 6 *Moore's Federal Practice* ¶ 56.15(8) at 56–641 (2d ed. 1980); *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968) (on summary judgment, defendant successfully demonstrated that the facts were not susceptible of the "interpretation" plaintiff advanced). Even in employment discrimination cases, summary judgment will be granted, if appropriate. *See e. g., Gatling v. Atlantic Richfield Co.,* 577 F.2d 185 (2d Cir. 1978), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 169 (1978); *Sagers v. Yellow Freight System, Inc.,* 529 F.2d 721, 728 n.13 (5th Cir. 1976) ("the fact that the [party opposing summary judgment] vigorously disputed the legal conclusions to be drawn from the facts presented by the [movant] was no bar to the grant of summary judgment"); *Anderson v. Viking Pump Div., Houdaille Industries,* 545 F.2d 1127 (8th Cir. 1976).

The City of Fairhope is entitled to summary judgment if there is no issue as to any material fact and if the City of Fairhope is entitled to a judgment as a matter of law. Although the City of Fairhope must demonstrate the absence of a material factual issue, when confronted with a properly supported motion for summary judgment, Oaks "must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), *Federal Rules of Civil Procedure.*

The Fifth Circuit long ago made clear that this court may not avoid its judicial obligation when presented a properly supported motion for summary judgment:

> Litigants have no difficulty finding expressions urging courts to have a due regard for a cautious observance of the requirements of a summary judgment or, if they are appellees, they may find expressions that summary judgments are looked upon with favor. Barron & Holtzoff, however, make the pertinent observation: "Cases voicing such sentiments as that courts should be slow to grant summary judgment and that any errors should be on the side of caution, should be limited to their facts. [Rule 56] itself provides that 'the judgment sought shall be rendered forthwith if * * * there is no genuine issue as to any material fact and * * * the moving party is entitled to a judgment as a matter of law.'" 3 Barron & Holtzoff, *Federal Practice and Procedure,* § 1231.

*Bruce v. Travelers Insurance Co.,* 266 F.2d 781, 786–87 (5th Cir. 1959).

nesses in Fairhope." Although affidavits were not forthcoming, Oaks thus had 60 days to acquire and present factual matter in opposition to summary judgment. Counsel for each party has fully reviewed and presented the record to this court.

The court has fully considered the pleadings and depositions on file, the affidavits and exhibits filed in connection with the motion for summary judgment, and the briefs of counsel for the respective parties, including Oaks' response to motion for summary judgment (hereafter cited "Oaks Response"). The court concludes that there is no genuine issue as to any material fact and that based upon the following Findings of Fact and Conclusions of Law, the City of Fairhope is entitled to a judgment as a matter of law.

FINDINGS OF FACT

1. Oaks is the former librarian at the Fairhope Public Library ("the Library"). Oaks was terminated as librarian effective September 30, 1979, and currently resides in Park Forest, Illinois, where she is the librarian at the Flossmoor Public Library. (Oaks at 6)[2]

2. Defendant City of Fairhope is an incorporated municipality in Baldwin County, Alabama. The City of Fairhope is authorized to establish and maintain, or aid in establishing and maintaining, a free public library for the use of the citizens of the City of Fairhope. (Complaint ¶ 3; Answer ¶ 3)

3. Defendant Board of Trustees of the Fairhope Public Library (Library Board) consists of five members appointed by the Fairhope City Council for four-year terms (Complaint ¶ 4; Answer ¶ 4); Library Board members serve without compensation. *Code of Ala.* 1975, § 11–90–2. During the relevant period, the following persons were members of the Library Board: David Ed Bishop, Robert Mason, H. B. Shepherd (each individual defendants), Stevi Gaston and Jason Kutack.

4. Defendant James Nix (Mayor Nix) is the mayor of the City of Fairhope. Oaks' action against Mayor Nix is in his individual capacity *only.* (Complaint ¶ 5; Answer ¶ 5)

5. Defendant David Ed Bishop (Bishop) is the chairman of the Library Board; he is also an elected member of the Fairhope City Council. Since he is a member of the Library Board, Bishop refrains from voting on any issue before the Fairhope City Council if the issue is connected with the Library or the Library Board. Oaks' action against Bishop is in his individual capacity *only.* (Complaint ¶ 6; Answer ¶ 6; Bishop Affidavit)

6. Defendants Robert Mason (Mason) and Reverend H. B. Shepherd (Shepherd) are each members of the Library Board; each is sued in his individual capacity *only.* (Complaint ¶ 7; Answer ¶ 7)

7. Defendants Samuel E. Box, Jack A. Stipes, Trisha Nelson and C. O. McCawley are each members or former members of the Fairhope City Council; each is sued in his or her individual capacity *only* (Complaint ¶ 8; Answer ¶ 8). Defendants Billy Don Wiggins and Henry G. Bishop are former members of the Fairhope City Council; each resigned from the Fairhope City Council on May 28, 1979, and neither has held any position with the City of Fairhope or with the Library Board since that time (Bishop Affidavit). On October 27, 1980, counsel for the City of Fairhope stated upon the record that Henry G. Bishop was deceased (Answer ¶ 8).

8. On May 1, 1979,[3] Oaks filed Civil Action 79–0237–H against the City of Fairhope, the mayor of Fairhope, the members

2. The following depositions have been filed with the court: Plaintiff Hilda Claire Oaks; Defendants James Nix, David Ed Bishop, Robert Mason, H. B. Shepherd and Jack A. Stipes; Morris Ebenstein, Stevi Gaston, Deveraux Bemis, Donald Dryer, Judy Newman and Thomas Minder. Deposition testimony is cited by the deponent's last name and by the page number. Affidavits of David Ed Bishop, J. Kirk, Nena Shelley, E. Hanson, Graham Heath and T. W. Diamond have also been filed in support of motion for summary judgment.

3. In order to present a complete picture, the court shall refer to certain facts that predate May 25, 1979. In each instance, such facts shall be clearly identified as occurring prior to that date. As appears more fully hereafter, no fact arising prior to May 25, 1979, is relevant in this action and the court has not relied upon any such fact in ruling upon the Motion for Summary Judgment.

of the Fairhope City Council and the members of the Library Board. The first Complaint set forth several state and federal claims. In pertinent part, Oaks alleged: *first,* a breach of a written contract of employment and a denial of property without due process of law under the fourteenth amendment; *second,* infringement of first and fourteenth amendment rights of freedom of speech and freedom of the press; and *third,* sex discrimination in violation of the equal protection clause of the fourteenth amendment.

9. Civil Action 79–0237–H resulted in a negotiated Settlement Agreement on May 25, 1979 (Complaint ¶ 29; Answer ¶ 29). A copy of the Settlement Agreement is attached to the Complaint in this action and states in pertinent part:

SETTLEMENT AGREEMENT

1. This Settlement Agreement is entered into by the parties to adjust all of their differences and to effect a reconciliation for the best interest of the City of Fairhope, its citizens, its Library Board, and the parties.

* * * * * *

3. The purported contract between the Library Board and [Oaks] dated April 19, 1979, is hereby rescinded.

4. [Oaks] will be reinstated as director of the Fairhope Public Library effective May 28, 1979, and will not be discharged from such position prior to September 30, 1979, unless in the meantime she is discharged for good cause.

If a majority of the Library Board desire to terminate [Oaks'] employment on September 30, 1979, they may do so by giving her written notice to such effect not less than two weeks prior to said date. Such notice shall be in writing signed by at least a majority of the then members of the Library Board.

5. [Oaks] shall receive compensation during the period of her employment at the rate of $14,000 per year and shall promptly be retroactively reimbursed for any such compensation which she has not received since the prior termination of her employment.

6. While the Library Board shall not be required to show cause on September 30, 1979, if they elect to terminate [Oaks'] employment as Director of the Library, they may not terminate her services for reasons which would violate her federally protected constitutional and legal rights insofar as such rights have been violated after the date of this Settlement Agreement.

7. In the event that [Oaks'] employment is continued after September 30, 1979, the terms and conditions of such employment shall be as may be mutually agreed upon by [Oaks] and the Library Board.

8. In the event that [Oaks] should assert or attempt to assert any claimed cause of action or demand of any kind whatsoever against any person or persons or entity whatsoever on account of the receipt of notice of termination of her employment as of September 30, 1979, nothing said, done, or occurring prior to May 25, 1979, shall be admissible in evidence in any proceeding brought in connection therewith, nor in anywise relevant thereto.

It is expressly agreed that [Oaks] shall not be entitled to any hearing or other proceeding incident to or with reference to notice of termination of employment effective September 30, 1979.

Court costs will be paid by the defendant City of Fairhope, and [the City of Fairhope] will also pay [Oaks'] legal fees in the manner previously agreed on.

10. This case [first Complaint] will be dismissed with prejudice.

11. Nothing in this Settlement Agreement shall be construed to be an admission by any party of any liability in this matter or an admission of the truth of any of the allegations of the Complaint or of the Answer.

Complaint ¶ 30, Appendix B. The Settlement Agreement was executed by C. B. Arendall, Jr., as counsel for all defendants and by James U. Blacksher, as counsel for Oaks. Mr. Blacksher also represents Oaks in the present action.

10. As provided in the Settlement Agreement, Oaks was reinstated as director of the Library at a salary of $14,000 per year, and was paid backpay by the Library Board (Complaint ¶ 30, Appendix B).

11. Oaks' tenure as director of the Library between May 25, 1979, and September 30, 1979, was wrought with public controversy virtually from the outset (Bishop at 20, 54–55, 65–68; Stipes at 35–36; Mason at 49, 91–92, 108–109; Shepherd at 48, 35–37; Gaston at 38–43, 62; Bemis at 36–37). Even the issue of the backpay due Oaks under the Settlement Agreement was made the subject of a dispute by an Oaks supporter. Library Board chairman Bishop voted with the majority to have the Library Board (Oaks' employer) rather than the City of Fairhope pay the backpay due Oaks under the Settlement Agreement. An active Oaks supporter, Devereaux Bemis, subsequently filed an ethics charge against Bishop with the State Ethics Commission based upon his vote. Although Bemis himself apparently questioned whether the charge was "decent" or "totally absurd," he alleged that Bishop was an individual defendant in Oaks' first lawsuit and that he personally profited by his vote to have the Library Board pay the backpay. The charge was resolved in favor of Bishop. (Bemis at 56–58, 32–33) Stevi Gaston, a Library Board member who supported Oaks (Gaston at 38), testified that after Oaks' reinstatement, Oaks became a hot topic of discussion: people were "talking about it all over town." Gaston testified that the community was sharply divided over the Oaks issue and Gaston herself was interviewed on television regarding the prospects of Oaks' future employment. (Gaston at 52–56) After May 25, 1979, Oaks' supporters organized and attempted to rally public support for Oaks (Dryer at 42–44; Bemis at 20–22).

12. Although the Library Board took no formal action affecting Oaks' employment prior to voting on August 30, 1979, not to continue Oaks' employment beyond September 30, 1979, the public controversy over Oaks' continued employment spilled over into meetings of the Library Board. Whereas before and after the Oaks controversy few if any people attended Library Board meetings, between May 25, 1979 and September 30, 1979, over a hundred people frequently attended. The Library Board meetings were characterized by loud, boisterous crowd behavior that disrupted the business of the Library Board. Library Board member Stevi Gaston, herself an Oaks' supporter, characterized the Library Board meetings as "rowdy" and further testified that there was "shouting." (Gaston at 23–26, 38–42; Bishop at 17–20, 51–55, 61, 65–68, 70–71; Mason at 49–50, 61, 91–92, 108–109; Shepherd at 35–37, 48)

13. Whether or not Oaks actively fueled the public controversy after May 25, 1979, the undisputed facts demonstrate that she did nothing to cool the controversy. After May 25, 1979, Oaks was contacted by the news media on a regular basis and permitted ten to twelve interviews with media personnel; newspaper and television media representatives also attended some Library Board meetings after that date (Oaks at 168–169). Oaks voluntarily submitted to interviews by media personnel and candidly remarked: "there were interviews ... it was a ... news item" (Oaks at 169). After May 25, 1979, Oaks also gave several speeches regarding what she characterized as her "struggle" (Oaks at 171). Oaks was invited to speak about her case at the American Library Association Intellectual Freedom Roundtable meeting in Dallas, Texas, in June 1979 and also spoke on the same subject to the Bay Area Library Association in Mobile during the same period (Oaks at 169–171). Oaks was quite candid regarding the reasons she was invited to speak to such organizations:

> [B]ecause I had been the case during that particular budget year that [the American Library Association] had so I was invited to talk about their involvement in my, in my struggle, in my case.

(Oaks at 171). During the same period, Oaks was also a guest speaker at a public library class at the University of Alabama regarding the involvement of the American Library Association in her case, the positions of librarians in the State of Alabama

and the kind of job security that librarians enjoy in the State of Alabama (Oaks at 172).

14. Perhaps the most significant event that transpired prior to Oaks' termination was the August 9, 1979, meeting of the Library Board. At that meeting, Oaks submitted the proposed Library budget for fiscal 1980 to the Library Board for review and ultimate submission to the City Council.[4] At the meeting, Library Board Chairman Bishop proposed postponing consideration of the budget until further work on the budget could be completed by the librarian and the Library Board in order to obtain approval from the City Council. Bishop's suggestion was greeted by an adverse crowd reaction from the approximately one hundred and fifty persons at the meeting. The crowd reaction prompted Bishop to table his suggestion and the Library Board voted simply to submit the budget as proposed by Oaks directly to the City Council. The City Council subsequently "turned down" the proposed budget and appropriated approximately $10,000 less. (Bishop at 17–20, 55–59; Gaston at 44–45; Bemis 36–42)

15. Library Board members Bishop, Mason and Shepherd subsequently consulted with attorney Charles Arendall regarding the proper procedure for terminating Oaks under the Settlement Agreement. The three had previously consulted Arendall regarding Oaks' termination in late July, but had temporarily abandoned such action. At that time, the three Library Board provided the initial input for Arendall to draft a letter to Oaks stating reasons why the three Library Board members deemed her continued employment inadvisable and offering Oaks an opportunity to resign. Attorney Arendall now completed a second letter (virtually identical) and mailed the letter to Library Board chairman Bishop for submission to Oaks. On August 29, 1979, Bishop delivered the letter to Oaks at the Library. Library Board members Stevi Gaston and Jason Kutack, both Oaks supporters, were present at the Library when Bishop delivered the letter.[5] (Bishop at 21–35; Mason at 76–77)

16. Oaks considers it significant that the Library Board, with the assistance of attorney Arendall, initially prepared a letter in late July 1979, which was substantially the same as the letter that was ultimately delivered to Oaks in late August 1979. It is undisputed that a majority of the Library Board (Mason, Shepherd and Bishop) considered Oaks' termination in late July, visited attorney Arendall to that end and, with the assistance of Arendall, prepared a letter to Oaks. The reasons stated in each Library Board letter, however, were readily apparent in late July 1979. *See* Finding of Fact ¶ 38 *infra*. Library Board chairman Bishop testified regarding the "disruption" that developed "over a period of time" (Bishop at 65–66), and Library Board member Shepherd described the "increasing" division, disturbance and disruption in the community (Shepherd at 47–48). Furthermore, Library Board member Gaston, an Oaks supporter, described the "rowdy" crowd behavior that characterized and disrupted *all* post-Settlement Agreement Library Board meetings (Gaston at 38–42).

17. The three Library Board members reconsidered their initial decision (in late

4. Library Board chairman Bishop testified that on August 7, 1979, he met with Oaks regarding the budget and stated that the bottom-line figure was excessive and that the Library Board would be unable to obtain City Council approval for such a large increase. He requested that Oaks engage in work sessions with the Library Board on specific budget items to obtain a more acceptable bottom-line figure. Bishop proposed postponing consideration of the budget that was scheduled for the August 9, 1979, Library Board meeting and testified that Oaks agreed to the procedure. Bishop further testified that the subsequent crowd reaction to his proposed postponement of budget consideration led him to believe that Oaks had betrayed him and caused him to lose confidence and trust in Oaks. Oaks apparently denies the conversation took place (Bishop at 17–20, 57–61). The court need not resolve the factual dispute and will not do so on summary judgment.

5. Oaks surreptitiously tape-recorded the brief conversation between herself and Bishop when the letter was delivered at the Library (Bishop at 40).

July) after seeing a magazine article in the July 1979 *Library Journal* which indicated that Oaks was once again preparing to institute federal litigation to challenge her own Settlement Agreement [6] (Bishop at 20–25; Shepherd at 55). Library Board chairman Bishop further testified that the *Library Journal* article made the Library Board members consider whether "we just hadn't done enough ... to make things work" (Bishop at 22):

> [I]t all caused me to change my mind at that point because, ... I definitely didn't want to think of the City becoming involved in any more long and drawn out legal implications and costly expenditures that the City could not afford. And we would definitely go back and try to work harder and try to make things work.

(Bishop at 23). Shortly thereafter, however, the theatrical disruption at the August 9th Library Board meeting renewed the Library Board members' resolve to terminate Oaks effective September 30, 1979 (Bishop at 64–66).

18. The Library Board letter advised Oaks that a majority of the members of the Library Board had concluded that Oaks' employment as director of the Library would not be continued beyond September 30, 1979. In pertinent part, the letter provided:

> We certainly have no wish to cause you any public embarrassment and, accordingly, we are offering you the opportunity to resign your position prior to the meeting of the Library Board on August 30, 1979. If you chose not to do so, the issue of your continued employment beyond September 30, 1979, will be taken up and decided at that meeting.
>
> While I [Chairman Bishop] recognize that under the terms of the Settlement Agreement between you and the defendants in your recent law suit no cause, reason, or explanation for your termination need be given, I believe it fair to summarize for you the reasons why, I believe, a majority of the members of the Library Board do not wish your continued employment.
>
> *First,* there seems to be a fundamental philosophical difference between you and the Library Board as to the proper functions and division of authority between the director and the Library Board. We believe that consciously or unconsciously you have attempted to infringe on the policy making duties and powers of the Library Board, rather than concentrating on administrative and service functions of the director position. We believe that it is the duty of the Library Board to establish goals, policies, and programs for the library, and the duty of the director to see that they are carried out.
>
> *Second,* we do not believe that you in particular, and some of the library employees for whom you are responsible, have a proper rapport with the public. We believe that you have attempted to operate the Fairhope Public Library as a personal enterprise and for the benefit and in accordance with the wishes of a small clique, rather than for the benefit of the citizens as a whole, many of whom you seem to disdain as common, uneducated, or non-intellectual. I have heard a number of citizen complaints that they do not feel welcome to the Library.
>
> *Third,* we believe that a qualified person can be obtained to serve as Director of the Library at a cost to the public considerably less than the salary you expect, and that you appear to require a larger and more expensive staff than we think necessary. We believe that we owe a duty to the public to provide library services in a most economical and efficient manner, taking into account the budgetary limits within which the library has to operate.

6. The *Library Journal* article that caused concern is attached as Exhibit 1 to the deposition of Thomas Minder (Oaks' current husband). The "threatening" portion of the article is as follows:

> [Under the Settlement Agreement], Oaks agreed not to make public again the events leading up to her dismissal and reappointment. But several lawyers, note Minder, have since declared that such an Agreement would not withstand court challenge since it would pave the way for infringement of freedom of speech rights protected by the First Amendment.

(Complaint, Appendix C). The letter is signed by David Ed Bishop, Chairman of the Library Board and by Library Board members H. B. Shepherd and Robert G. Mason.

19. On August 30, 1979, at a formal meeting of the Library Board, the Library Board voted not to continue Oaks' employment beyond September 30, 1979. A resolution to that effect was prepared and signed by Library Board members Bishop, Mason and Shepherd. Library Board members Stevi Gaston and Jason Kutack voted against the resolution. Oaks continued as the director of the Fairhope Public Library until September 30, 1979. (Bishop at 51; Gaston at 23–26)

20. In January 1980, Oaks accepted employment as the director of the Flossmoor Public Library in Flossmoor, Illinois, at a salary of $18,000 per year. After three months, the salary was raised to $18,500 per year. (Oaks at 158)

21. On June 23, 1980, Oaks once again filed a civil action against the City of Fairhope, the Library Board, Mayor Nix, Library Board members Bishop, Mason and Shepherd, and current and past members of the Fairhope City Council (Henry Bishop, Samuel E. Box, Jack A. Stipes, Billy Don Wiggins, Trisha Nelson and C. O. McCawley). The Complaint contains virtually identical factual allegations and claims for relief as were alleged in the first Complaint. Indeed, the allegations of paragraphs 1 through 27 of the Complaint (incidents occurring between June 30, 1977 and April 23, 1979) were all previously contained in the first Complaint.

22. In an effort to avoid the express provisions of the Settlement Agreement and the effect of dismissal of her prior action *with prejudice* pursuant thereto, Oaks alleged that subsequent to May 25, 1979, the City of Fairhope violated the Settlement Agreement and that the agreement could, therefore, not be interposed against Oaks (Complaint ¶ 31 and ¶ 32). The renewed Complaint once again asserts numerous federal and state claims. Generally, Oaks alleges that: she was subjected to sex discrimination (both in her termination and salary level); she was terminated for opposing sex discrimination *and* in retaliation for her first lawsuit; she was terminated for exercising first and fourteenth amendment rights; she was denied liberty and property interests without due process of law; she was defamed by the Library Board and by Mayor Nix; and, her termination breached a written employment contract. Oaks further alleges that the twelve named defendants "conspired" to accomplish all of the foregoing.

*Oaks' Employer*

23. Prior to the effective date of her termination on September 30, 1979, Oaks was employed by the Library under the exclusive management, control and supervision of the Library Board. Under Alabama law, the Library Board has "full power and authority" to control the expenditure of all funds received by the Library or appropriated to the Library, to employ both a librarian and other library employees, and to manage and control the Library. *Code of Ala.* 1975, § 11–90–3.

24. The Library is funded primarily by appropriations from the City of Fairhope. The librarian submits a proposed budget to the Library Board each year; after approval of the budget by the Library Board, the proposed budget is submitted to the City Council which appropriates operating funds for the Library. Only the total amount of the budget is approved and appropriated by the Fairhope City Council. The exclusive authority over expenditure of appropriated funds remains with the Library Board. By resolution of the Fairhope City Council, the Library is the recipient of all revenue-sharing funds received by the City of Fairhope and such funds constitute a large portion of the appropriated funds for the Library. The Library also receives additional funds directly from donations, user charges, book fines, sales and other library projects. The Library Board has exclusive control over the expenditure of all such funds. (Oaks at 19–34; Bishop affidavit)

25. Library employment policies and practices are exclusively under the control of the Library Board. The Library bylaws (Complaint Appendix A) provide that the librarian, under the direction and review of the Library Board, has "sole charge of the administration of the library." The bylaws further provide that the librarian has the authority to accept employment applications, employ library personnel (subject to Library Board approval) and to inform each new employee of the personnel policies and fringe benefits established by the Library Board. Separate personnel files on each Library employee are maintained at the Library. The bylaws also authorize the librarian to accept resignations and, with approval of the Library Board, to terminate employees. The exclusive responsibility and authority for hiring and firing library employees has always been vested in the librarian and the Library Board. (Bishop Affidavit)

26. The Library maintains separate accounting records; the records are audited each year by an independent bookkeeper retained and paid by the Library Board. The Library maintains separate savings, checking and payroll accounts (Library employees are paid from the payroll account); the Library also has a separate federal tax identification number and pays the social security and unemployment compensation taxes on its own employees. (Bishop Affidavit)

27. At the time Oaks was employed by the Library (and thereafter), the Library *never* had fifteen or more employees (Hanson Affidavit; Bishop Affidavit)

28. Oaks readily admitted that she was employed by the Library Board (Oaks at 83). Although Oaks would characterize the Library Board as a "city department," no facts support such a finding. Indeed, Oaks' Complaint alleges that she was terminated:

> because [she] refused to take directions directly from the [City of Fairhope], but insisted on acting pursuant to the directions of the [Library Board], the Board charged by Alabama law with *the duties and responsibilities* of being *her employer.*"

(Complaint ¶ 38(a); Oaks at 98–99). Oaks' replacement as librarian, Thelma K. Shelley, was hired by the Library Board effective October 1, 1979.

*Sex Discrimination*

29. Oaks was terminated effective October 30, 1979, and was replaced as librarian by another woman on October 1, 1979. Oaks nonetheless claims that her termination was based upon her sex. Oaks testified at length regarding incidents that she characterized as an "attitude of sex discrimination":

> Q. [D]escribe ... each wrong that you feel was committed against you on or after May 25, 1979, ... that had the intent of discriminating against you on the basis of your sex.
>
> * * * * * *
>
> A. Alright. The attitude of sex discrimination or the *attitude of antagonism toward me* was a continuing attitude. This was not something that went away with the Settlement Agreement.

(Oaks at 35) (emphasis supplied). Oaks recounted a litany of incidents she deemed constituted an "attitude of sex discrimination" or personal "antagonism," including hearsay sexual slurs (Oaks at 36, 38–40, 70), *unidentified* threatening phone calls (Oaks at 51–52), being followed by *unidentified* City of Fairhope maintenance trucks (Oaks at 53, 56; Oaks deemed being followed sex discrimination because she, as a woman, would be more frightened than a man) and whistles and catcalls by *unidentified* City of Fairhope employees (Oaks at 59–61; "These comments would not have been made if I were a male.").[7]

7. The *only* nonhearsay incident involving a defendant related by Oaks in fifty pages of deposition testimony regarding the "attitude of sex discrimination" was an alleged police radio transmission by Mayor Nix directing police to engage in surveillance of Oaks' residence (Oaks at 54; Newman 14–19); Mayor Nix denied the report (Nix at 63). Oaks admitted that after

30. The court has fully considered the relevant and admissible statements that allegedly demonstrated an "attitude of sex discrimination" (Oaks at 35–89). No facts, however, support a finding that Oaks' employment was terminated *because* of her sex. At most, the testimony demonstrates *personal* animosity directed toward Oaks by *unidentified* individuals. Oaks testified:

Q. Do you believe that these things you have testified to were discrimination against you because you are a woman or because you were a particular woman, Claire Oaks?

A. Well, certainly because I was a particular woman. Because I was who I was.

(Oaks at 74).

31. Although Oaks was admittedly replaced by a woman, she apparently contends that she was terminated not simply because she was a woman, but because she possessed traits or characteristics that would have been tolerated in a male employee but were intolerable in a female employee (Oaks at 75 "I don't believe that a male possessing these traits would have been subjected to the sort of things that I was subjected to.")[8] None of the characteristics Oaks purportedly possessed were immutable characteristics. Furthermore, no facts support a finding that a hypothetical male librarian possessing similar characteristics would have been treated differently under similar circumstances.

32. Oaks' primary contention, however, is *not* that her termination was the product of sex discrimination, but that the librarian's *position* is relegated to second-class status as result of sex discrimination:

Q. Do you contend that the Library Board's action of hiring a woman to replace you at a salary of $12,000.00 [Oaks was paid $14,000] was sex discrimination against you?

A. I think it was sex discrimination against the position and, therefore, against myself. I had been a librarian in that position. They obviously felt that it was not worth more than $12,000.00 and especially since they had said in the letter [Complaint Appendix C] that I required too much money.

(Oaks at 89). Oaks contends that the librarian was paid a salary that is substantially less than the salaries paid other "similarly situated male department heads in the City of Fairhope" (Complaint ¶ 35):

I also was paid less than the employees, the heads of the departments at the City who were men *who certainly had nothing like the amount of education that I had.* There was, the decision was made to cut the Librarian's salary. There was the opinion by the members, some of the members of the Board of Trustees [Library Board], that they could find someone who would take the job for less money than I would accept or than that they had been paying me, not that I would accept, but that I had been paid.

(Oaks at 36) (emphasis supplied).

I believed that certain of these department heads did not have *nearly* the responsibility that I had as librarian and that the salaries that were paid to them were inordinately high compared to mine.

(Oaks at 41) (emphasis supplied).

33. Oaks admitted that she was employed by the Library Board, that she was the only "department head" employed by the Library Board and that other "department heads" were employed by the City of Fairhope (Oaks at 41, 45, 83).

34. Although the facts do not support a finding that the Library Board is a "city

May 25, 1979, she had no knowledge of actual police surveillance (Oaks at 54). Although the court must accept the report as true for the purpose of summary judgment, no facts demonstrate that the transmission was in any way related to Oaks' sex.

8. Oaks repeatedly refers to being characterized as an "uppity woman" and a "bitch." Certain of the statements were admittedly made prior to May 25, 1979 (Oaks at 38). Supporter D. Dryer did testify to one apparent non-hearsay statement by a city council member referring to Oaks as "that woman" or "that uppity woman" (Dryer at 50–55).

department" (Oaks at 83), the court has thoroughly reviewed affidavits regarding the duties performed by the librarian and the duties performed by City of Fairhope department heads (Shelley Affidavit; Kirk Affidavit). It is undisputed that the city department heads are paid more by the City of Fairhope than the librarian is paid by the Library Board. The duties of the city department heads, however, are *wholly* dissimilar from the duties performed by the librarian. Because the duties are simply not similar, a meaningful comparison with regard to skill, effort and responsibility is virtually impossible. Oaks' testimony that City department heads "had nothing like the amount of education [Oaks] had" (Oaks at 36), as well as her testimony that the department heads "did not have nearly the responsibility that [Oaks] had as librarian" (Oaks at 41), simply does not address the nature of the duties in fact performed.[9]

*Opposition To Sex Discrimination*

35. Oaks' complaint alleges that she was subjected to retaliation, including termination, because of her attempts to "vindicate her federally protected right to be free of sex discrimination" (Complaint ¶ 36). Oaks admitted, however, that after May 25, 1979, she made *no* attempt to oppose unlawful employment practices and that her retaliation claim was based exclusively upon her having filed a previous lawsuit (Oaks at 91).

*Retaliation*

36. Oaks admits that her retaliation claim is based exclusively on her belief that her termination was the result of her first lawsuit against the same defendants (Oaks at 91). No facts support a *causal connection* between the first lawsuit and Oaks' termination. The mere fact that Oaks filed the first lawsuit, standing alone, is precluded by the Settlement Agreement. While Oaks could not be terminated on September 30, 1979, *because* she filed such an action, Oaks must establish a causal connection by facts postdating May 25, 1979. Oaks adduced no admissible evidence that her termination by the Library Board effective September 30, 1979, was in retaliation for her first federal lawsuit.

37. Absent direct evidence that her first lawsuit played any part in her subsequent termination (on the precise date permitted under the Settlement Agreement), Oaks cites purported "circumstantial evidence" of a retaliatory motive. *Three* incidents relied upon by Oaks typify the "specific facts" Oaks proffers to show there is a genuine issue for trial.[10] *See* Rule 56(e), *Federal Rules of Civil Procedure.* Each incident is inadmissible hearsay and each incident is demonstrably incorrect. Yet, in opposition to summary judgment, Oaks cites the incidents *eight different times.*

(a) First, Oaks (and a supporter, J. Newman) testified that *Mobile Press Register* reporter Graham Heath (Heath) interviewed Mayor James Nix after the Settlement Agreement and that Heath *reported* that Nix had informed Heath that either "her [Oaks'] ass is grass" or "she [Oaks] has seen her better days" (Oaks Response ¶¶ 17e, 22d, 34b; Oaks at 37, 62–63; Newman at 12–14). Oaks incorrectly asserts that the statement is admissible as an "admission" under Rule 801(d)(2), *Federal Rules of Evidence.* The statement would be admissible as an admission, however, only if Heath testified to the statement. Otherwise, either Oaks' or Newman's testimony that Heath reported the statement to

9. The court notes that many governmental entities are now constrained to impose budget cuts. Perhaps regrettably, public library and public recreation department expenditures are often the first victims of budget cuts. This court cannot, however, conclude that a municipality must fund a library (including the librarian's salary) on equal footing with municipal departments that provide essential municipal services.

10. As with her other claims, Oaks' testimony regarding the alleged retaliation is replete with rumor, reports and self-proclaimed "hearsay" (Oaks at 40). Oaks contends that much of the circumstantial evidence of "retaliation" is direct evidence of sex discrimination, as well. The cited admissible facts, however, simply do not support a finding that Oaks was terminated *because* of her sex.

them is inadmissible hearsay. *See* Rules 802 and 805, *Federal Rules of Evidence; Cedeck v. Hamiltonian Federal Sav. and Loan Assoc.,* 551 F.2d 1136 (8th Cir. 1977). Heath not only denied the statement, he also expressly advised Oaks and her legal counsel that Mayor Nix did *not* make such a statement. *See* Heath Affidavit. Yet, Oaks knowingly relies upon the inadmissible and incorrect testimony on three separate occasions.

(b) Second, the Oaks Response states that "Library Board member, Robert Mason, is *purported* to have said that 'we will be rid of the bitch by October'" (Oaks Response ¶¶ 17b, 22d) (emphasis supplied). Once again, Oaks asserts that the statement is an "admission" under Rule 801(d)(2). Once again, the statement is inadmissible hearsay. The "purported" statement was reported to Oaks by her advisor, Morris Ebenstein, who allegedly received the report from an *unidentified* source:

Q. Did Morris Ebenstein tell you where he got his knowledge of the statement?

A. No, he didn't. And, as I said, much of this is hearsay and rumor.

Q. So the statement was reported to you by Morris Ebenstein, but he did not tell you where he heard the statement?

A. Thats true.

* * * * * *

Q. [Morris Ebenstein] did not hear the statement himself?

A. No, he didn't.

(Oaks at 40). Morris Ebenstein testified that he had no first hand knowledge of any facts demonstrative of sex discrimination (Ebenstein at 109–11).

(c) Third, Oaks apparently construed a WKRG television interview with Mayor James Nix shortly after the Settlement Agreement as demonstrating both a retaliatory motivation and a conspiracy to terminate Oaks because of her sex (Oaks Response ¶¶ 22e, 34a). Oaks *interpreted* the mayor's "words and demeanor" during the television interview as retaliatory (Oaks Response ¶¶ 22e, 34a; Oaks at 63–64). The videotape of the television interview demonstrates Oaks' strained *interpretation* of fact. *See* Affidavit of Thomas W. Diamond, custodian of film archives at WKRG–TV, Inc., together with the entire film clip of the interview with both Mayor James Nix and Oaks on May 29, 1979. Regardless whether Oaks' testimony concerning the content ("words and demeanor") of the video transcription is admissible, *see* Rule 1004, *Federal Rules of Evidence,* the actual video transcription of the interview does not support either a retaliatory motive or a conspiracy to terminate Oaks because of her sex. *See* Rules 1001(2), 1002–1003, *Federal Rules of Evidence.*

38. The balance of Oaks' circumstantial evidence consists of Oaks' *disagreement* with both the reasons given by the Library Board for her termination and the Library Board's refusal to participate in a public debate regarding her continued employment. Oaks complains that the individual members of the Library Board forwent the opportunity at the August 9, 1979 Library Board meeting to discuss publicly complaints they may have had with Oaks continued employment (Oaks Response ¶ 22a). Although the Library Board admittedly acted on advice of legal counsel, Oaks also condemns the Library Board's refusal to discuss the contents of the letter which offered Oaks the opportunity to resign (Oaks Response ¶ 22g). In substance, Oaks proffers as circumstantial evidence of retaliation the fact that the Library Board refused to afford Oaks a public forum or hearing to discuss her continued employment.

(a) Under the express terms of the Settlement Agreement between Oaks and the Library Board, the Library Board was *not* required to debate publicly the reasons for Oaks termination (Settlement Agreement ¶ 6). Furthermore, the Settlement Agreement stated:

> It is expressly agreed that [Oaks] shall not be entitled to any hearing or other proceeding incident to or with reference to notice of termination of employment effective September 30, 1979.

(Settlement Agreement, ¶ 8). The Library Board members' reluctance to open public debate on Oaks' continued employment (Mason at 91, "it was an adversary position") was clearly dictated by the Settlement Agreement and offers absolutely no factual support for a causal connection between Oaks' termination and her first federal lawsuit.[11]

(b) Oaks further contends that defendants Bishop, Mason and Shepherd were unable to substantiate the accusations they made against Oaks in the Library Board letter (Oaks Response ¶ 22a; ¶ 22b and ¶ 22c). Oaks confuses her *disagreement* with the Library Board's reasons for her termination with the Library Board's ability to substantiate such reasons (*See* Oaks Response ¶ 22b and ¶ 22c). Contrary to Oaks' assertion, the Library Board members did substantiate the reasons cited in the Library Board letter. Although there was no consensus, the Library Board members each offered testimony regarding the reasons stated in the letter.

(c) The Library Board letter stated that there appeared to be a "fundamental philosophical difference" between Oaks and the Library Board and that Oaks "consciously or unconsciously ... attempted to infringe on the policy making duties and powers of the Library Board." Library Board members Bishop and Mason testified regarding Oaks' apparent disregard of the "chain of command"; i. e., Oaks apparently put herself and her supporters ahead of the people of the City of Fairhope in general (Mason at 37, 48–49, 93, 108–109; Bishop at 51–52, 61; Shepherd at 47–48). Perhaps Library Board Chairman Bishop best described the "fundamental philosophical difference" which developed "over a period of time" and was characterized by Oaks' "conscious or unconscious" attempt to infringe upon the policymaking duties of the Library Board (Bishop at 65). Bishop testified that the budget of the Fairhope Public Library had dramatically increased from $15,000 per year to over $60,000 per year in a very short period (one of the highest per capita contributions in the State of Alabama) (Bishop at 53). Oaks, however, consciously or unconsciously aligned herself with a clique that precipitated a public controversy regarding the library budget generally and Oaks' salary in particular—*a controversy that resulted in agitation, intimidation, interrogation and disruption at Library Board meetings* (Bishop at 65):

> It was like a drama club.... These people apparently were very close in the community and they did come and they tried to do everything they could to disrupt meetings if anybody went against anything they said.
>
> * * * * * *
>
> I felt like whether [Oaks] did it consciously or unconsciously, it happened. And it was because she was there; they evolved around her.

(Bishop at 65–66). Although Oaks apparently contends that her association with a clique that sought intentionally to disrupt Library Board meetings is protected under the first amendment, Bishop's testimony certainly explains the "philosophical difference" described in the Library Board letter.

(d) The Library Board letter also states that Oaks lacked a "proper rapport with the public" in general, but rather sought to operate the library as

> a personal enterprise and for the benefit and in accordance with the wishes of a small clique, rather than for the benefit of the citizens as a whole, many of whom [Oaks] seemed to disdain as common, uneducated or nonintellectual.

Library Board Chairman Bishop testified that the cited reason (and even the lan-

11. Oaks initially complained that the Library Board letter was "stigmatizing" and defamatory (Complaint ¶ 31b, ¶ 40 and ¶ 47). The Library Board's diligent efforts to avoid publication of the contents of the letter militated against such claims. *See* Finding of Fact ¶¶ 54–59. Oaks now complains because the Library Board forwent the opportunity to open public debate regarding the reasons for her termination. As Library Board Chairman Bishop testified, in dealing with Oaks, the Library Board was "damned if [we did] and damned if [we didn't] (Bishop at 29)".

guage) was based primarily upon a letter the Library Board received from a citizen of the City of Fairhope:

> Two stories in last week's paper greatly disturbed me. The first in the Courier of 6/28/79 in "Library Lines" tells that our librarian is in Dallas speaking on "Intellectual Freedom" and taking part in the activities of the "Freedom to Read Foundation." The second in the Register of the same date, in which the librarian's Attorney "clarifies librarian's position" says "Blacksher noted that any actions by either party which would be disparaging of the other would be deemed a breach of the Agreement."
>
> To me these two stories mean the librarian can continue to pursue personal aggrandization at the taxpayers (city) expense while the taxpayers (city) are threatened with another suit if "anything is done to disparage" her. Not renewing her contract (i. e., firing her) certainly would be construed as "disparagement."
>
> * * * * * *
>
> It is time for the silent opposition to speak out.
>
> * * * * * *
>
> The only change I can see [at the Fairhope Public Library] is in the *quality* of the service. The Dewey Decimal System has been deified and the poor patron who needs help is an unwanted interruption with the main business of classifying and cataloging books. I had pleasanter personal service from the library at the University of Chicago than I now find in the Fairhope Public Library.
>
> I do not stand alone with these opinions nor does all the opposition come from small towns simpletons as one clique would have you believe. We include a cross section of citizens, northern newcomers as well as southern old-timers and, with the court's permission, we would like to be considered.

(Letter from Eloise T. Wilson, Bishop Affidavit ¶ 15, Exhibit 3; Bishop at 68–71).[12]

(e) Finally, the Library Board letter states

> that a qualified person can be obtained to serve as Director of the Library at a cost to the public considerably less than the salary you [Oaks] expect, and that you [Oaks] appear to require a larger and more expensive staff than we think necessary.

The budgetary reason was primarily a concern of Library Board member Mason (Mason at 64, 96). Although Library Board Chairman Bishop did not believe Oaks was overpaid, he did testify that other applicants would serve for less and that the assistant librarian (a "professional librarian" with a masters degree hired during Oaks' tenure) was unnecessary (Bishop at 76–79; Oaks at 24–25). The assistant librarian resigned when Oaks was terminated and was not replaced (Mason at 96). Furthermore, Oaks was admittedly replaced by a female librarian at a salary $2,000 less than Oaks was receiving.[13]

(f) Each Library Board member who voted to terminate Oaks' employment effective September 30, 1979, testified that as of the date of the Settlement Agreement (May 25, 1979) all differences between Oaks and the Library Board were "adjusted" and that a "reconciliation" was achieved (Bishop at 12; Mason at 27–29; Shepherd at 24, 27; Settlement Agreement ¶ 1). No admissible facts after the date of the Settlement Agreement contradict the testimony and no such facts demonstrate a causal connection between Oaks' termination and her prior lawsuit.

12. Oaks' apparent "disdain" for certain segments of the people of Fairhope as "uneducated, or non-intellectual" is perhaps best characterized by her own testimony:

> I was paid less than the employees, the heads of the departments of the City who were men *who certainly had nothing like the amount of education that I had.*

(Oaks at 36) (emphasis supplied).

13. Oaks apparently takes refuge in her offer to continue as librarian at the reduced salary (Oaks Response ¶ 32). Oaks did indeed offer to continue as librarian at a salary of $12,000—three weeks *after* she was notified of her termination (Blacksher Affidavit Exhibit D). Oaks' conscious efforts to fortify her contemplated litigation are not probative.

39. The court has conducted an exhaustive review of not only the facts cited by Oaks, but also the record as a whole. Oaks' "retaliation" claim is based upon the simple fact that she was terminated. The fact that Oaks initiated previous federal litigation, standing alone, is admittedly barred by the Settlement Agreement (Settlement Agreement ¶ 8). Oaks' proffered circumstantial evidence fails to raise a genuine factual issue for trial.

*First Amendment Claims*

40. Oaks apparently admits that her first amendment claim is appropriate for summary adjudication; in opposition to summary judgment, Oaks does not even suggest that there is a genuine issue of material fact. The factual foundations of Oaks' alleged first amendment claim, however, have been ever-changing. Oaks initially alleged that her termination infringed upon her first amendment rights of freedom of speech and freedom of the press. Oaks subsequently admitted on deposition not only that her freedom of press claim lacked factual support, but also that the specific factual allegations in support of her free speech claim (Complaint ¶ 38a through ¶ 38c) each pre-date the Settlement Agreement (Oaks at 98–99). Indeed, in her response to summary judgment Oaks candidly admitted "freedom of the press is not an issue in this case" (Oaks Response ¶ 54) and, at least for the purpose of summary judgment, states that she did not engage in any public or private expression whatsoever on a matter of public concern (Oaks Response ¶ 31). Oaks now contends that her first amendment claim is grounded upon "freedom of association"; i. e., that she was terminated because she associated with persons who opposed the political position of the defendants (Oaks Response ¶¶ 26–27).

41. Since Oaks admitted that the facts alleged in her Complaint all predated the Settlement Agreement, at deposition Oaks sought to supplement her first amendment claim with testimony that Library Board Chairman Bishop made a statement at the EEOC Fact Finding Conference on Oaks' EEOC charge:

> [T]hat his decision to vote for firing [Oaks] was because, at the [August 1979] meeting of the Library Board, there were a number of people, supporters of [Oaks], present and that [Bishop] felt it was obvious that [Oaks] had been on the phone asking them to come to the Library Board meeting to support [Oaks] and that these people wanted to talk about budget on that night and that [Bishop] thought that [Oaks] had asked them to talk about budget on that night.
>
> * * * * * *
>
> [T]here were many people at the meeting and it was obvious that [Oaks] had been telephoning them and asking them to come to support [Oaks] and that [Oaks] had asked them to talk about library budget on that evening, the people from the audience. (Oaks at 93–94).[14]

42. The court previously addressed the disruptive August 9th meeting of the Library Board (*See* Findings of Fact ¶ 14). Oaks' testimony is that Bishop reached the termination decision because "there were many people [supporters of Oaks] at the August 9th meeting."[15] Bishop did not deny that the statement was substantially correct but further gave uncontroverted testimony regarding the reason he objected

14. It is sharply disputed whether Oaks intentionally fostered disruption of Library Board meetings and betrayed the trust of her Library Board (Bishop at 17–20, 57–61); *see* Finding of Fact ¶ 14 n.4. For the purpose of summary judgment on the first amendment claims, however, the court must accept as true Oaks' contention that she did not either actively foster the disruption or betray the Library Board.

15. It is undisputed that the "disruption of Library Board meetings was not limited to the August 9th meeting; the disruption of Library Board business characterized all post-Settlement Agreement meetings (Gaston at 38–42, meetings were "rowdy"; Bishop at 65–68; Shepherd at 35–37, 48). Library Board chairman Bishop testified that the "disruption" developed "over a period of time" (Bishop at 65–66) and Library Board member Shepherd described the "increasing" division, disturbance and disruption in the community (Shepherd at 47–48).

to the crowd at the August 9th Library Board meeting and further testified that the August 9th crowd behavior was part of a larger problem:

> [A]s I explained ... *it was over a period of time*; ... it's a kind of a feeling that you developed by seeing how things operate. I attended meetings before this all ever came up; I saw the animosity that was going on and I felt like that *these people were concentrating themselves around the director and more or less implicating her into these problems* and that she was in essence causing a lot of the problems because of these people surrounding her.... [S]he stayed very close in touch with whoever they were and they did show up at meetings to agitate, intimidate and interrogate. I felt this was beyond her duty as a director. I didn't think it was proper and I still don't.
>
> It was like a drama club.... These people apparently were very close in the community and they did come in and they tried to do everything they could to disrupt the meetings if anybody went against anything they said.
>
> * * * * * *
>
> I felt like *whether [Oaks] did it consciously or unconsciously, it happened. And it was because [Oaks] was there*; they evolved around her.

(Bishop at 65–66) (emphasis supplied). Bishop's testimony regarding the disruption of Library Board business was substantiated by Oaks' supporters (Gaston at 38–49; Bemis at 39–41).

43. Oaks' negotiated Settlement Agreement permitted the Library Board to terminate her employment without cause effective September 30, 1979. It is undisputed that the community disruption continued unabated after the Settlement Agreement and caused disruption of Library Board meetings. Accepting as true Oaks' contention that she did nothing to foster the disruption, under the Settlement Agreement the Library Board was free to conclude that her *mere presence* precipitated the disruption:

> I really felt like—when this settlement was reached, I really felt like we were going to be able to restore the relationship that I had felt was in existence prior to this problem. And I had hoped that this would come to pass and that termination would not be necessary.... [T]hat's what I thought would happen and it didn't happen and the chasm was wider. Our community was divided, disturbed, disrupted in an increasing manner. It seemed that the problem had reached a magnitude that it would be better for her, as well as for the Library, the public in general, if a change in personnel came to pass.

(Shepherd at 47–48; *see also* Bishop at 65–66).

44. Oaks testified that Bishop's statement *led her to believe* (apparently as of the date of the EEOC fact conference) that the Library Board did not want Oaks to "promote" the Library budget (Oaks at 94). Bishop's statement does not, however, support a finding that Bishop objected to Oaks' "promotion" of as high a budget as the Fairhope City Council would approve (Bishop at 57–59); rather, his statement refers exclusively to the relationship among the Library Board, its employee (librarian Oaks) and the public, and the effect that the public disruption had on Library Board business. The record compels a finding that regardless whether Oaks solicited public support for herself at the August 9, 1979, meeting, she would have been terminated because of the continuing public controversy and disruption of Library Board meetings (Bishop at 65–66; Shepherd at 47–48; Finding of Fact ¶ 50, ¶¶ 11–14). As a result of the crowd reaction at the August 9, 1979 meeting, Bishop's proposal to postpone consideration of the budget was tabled and the bottom-line budget figure *in the amount proposed by Oaks* was subsequently submitted to the Fairhope City Council (Bishop at 57–59; Gaston at 44–49). The City Council disapproved the *entire* proposed increase; instead, the City Council appropri-

ated the same contribution that the City of Fairhope had made the previous year.[16]

*Conspiracy*

45. Oaks concedes that a conspiracy *per se* is not actionable and that under either 42 U.S.C. § 1985 or Alabama law she must adduce facts to establish a substantive claim. Since Oaks failed to adduce such facts, the "evidence" she recites as demonstrative of a purported conspiracy is unavailing. The court notes, however, that much of the evidence is based upon hearsay and surmise rather than permissible inferences from the facts. Furthermore, the court has serious doubts regarding Oaks' interpretation of any contact between members of the Library Board and the mayor or members of the City Council in a small community such as Fairhope as demonstrative of a devious conspiracy.

46. One event cited by Oaks merits specific consideration simply because Oaks suggests that it supports retaliatory motivation as well as a conspiracy. Oaks would offer as evidence of a conspiracy that Mayor Nix obtained "commitments" from *two new City Council appointees* (Trisha Nelson and C. O. McCawley) in connection with Oaks' dismissal. Councilman Stipes reported McCawley's account:

> [Mayor Nix] had asked me [McCawley] *would I interfere in any way* with the dismissal of Mrs. Oaks and I told him I didn't know anything about the case other than what I had read in the paper and I wasn't going to make a decision on it. *It wasn't up to me* and I wouldn't stand in the way.

(Stipes at 21–22). Stipes further testified that no formal commitment was made to the City Council (Stipes at 16) and that the council played no part in the termination decision (Stipes at 24–25). Oaks has steadfastly maintained that under the Settlement Agreement the City Council was to refrain from participation in the termination decision. Indeed, following the Settlement Agreement the consensus belief was that the Library Board would work without interference of the City Council (Bishop at 12–13; Mason at 30; Shepherd at 25; Nix at 24, 33; Stipes at 9–10), although nothing in the Settlement Agreement implies that the Library Board was forbidden from discussing the matter with the council. The purported commitments from two new members of the city council that they would not "interfere in any way with the dismissal of Ms. Oaks," is certainly consistent with that interpretation. Oaks' interpretation that the commitments were other than a pledge not to interfere is impermissible. Indeed, on deposition, Mayor Nix denied that he had solicited *what Oaks counsel characterized* as a "promise to support the termination of Ms. Oaks" (Nix at 20). A "promise to support termination" is a far cry from a commitment not to interfere in any way. Councilman Stipes verified that conclusion:

> There was discussion [regarding Oaks], what was going to happen, different ones of us said that. But we just tried to stay out—the Council, *like I stated before, did not want to interfere* with the [Library] Board, what the Board was going to do. But they [council members] questioned the Board and asked them different things, you know, how it was going down there. But, as far as making any discussions on what to do, I don't think that the Council had any—I knew I didn't; I was not going to get involved with it again because it was so stated by our attorney not to, not to have any conversations as far as with people on the street....

(Stipes at 24–25). Oaks cites no facts to suggest that such a commitment was either solicited from or proffered by the members of the Library Board.

*Libel And Slander—Public Figure*

47. Oaks' defamation claims are based both upon the Library Board letter specify-

16. The yearly contribution of the City of Fairhope to the operating budget of the Library increased from approximately $15,000 in 1972 to approximately $60,000 in 1979; i. e., a contribution of over $10.00 per capita, which is one of the highest in the State of Alabama (Bishop Affidavit; Bishop at 52–54; Nix at 56).

ing reasons for her termination and upon certain newspaper statements attributed to Mayor Nix in September 1979 (Complaint ¶¶ 45–47, ¶ 31b). An initial determination is whether Oaks is a "public figure" insofar as her "struggle" with the City of Fairhope is concerned (Oaks at 171).

48. After May 25, 1979, Oaks maintained her status as a prominent news figure due, in large part, to her own actions. Immediately following the settlement of her first lawsuit, Oaks' remarks concerning the settlement were widely published in local newspapers: "Reinstated Librarian Discusses 'Victory'," *Mobile Press-Register* (May 30, 1979); "Librarian Back On Job After Court Settlement," *Independent* (May 30, 1979).[17] Oaks was profiled in the national periodical *Library Journal* in both June and July of 1979, and received national exposure in Calvin Trillin's *New Yorker* (July 11, 1979) magazine article entitled "U.S. Journal: Fairhope, Ala.—Control." Indeed, on June 21, 1979, Oaks noted unabashedly in the "Library Lines" column she wrote for the *Eastern Shore Courier* that additional copies of *The New Yorker* article were available at the Library. The fact that Oaks spoke to the American Library Association Intellectual Freedom Committee in Dallas, Texas, was also publicized in the "Library Lines" column (June 28, 1979). (Summary Judgment Exhibit 1 at 5–10, 50–53, 66)

49. The Library Board decision to terminate Oaks commanded a front-page headline and photograph in the *Eastern Shore Courier* (September 3, 1979), and Oaks offered her own reaction to a number of newspaper reporters: "Librarian to Renew 'Dirty Book' Fight," *Atlanta Constitution* (September 30, 1979); "Librarian Eyes Court Aid," *Independent* (September 5, 1979). The *Atlanta Constitution* article ("Librarian to Renew 'Dirty Book' Fight") was carried on the Associated Press wire service and reprinted in several newspapers throughout the South (Oaks at 141–142; Complaint ¶ 46). Oaks was subsequently named "Woman of the Year" in a local *radio* station poll of area residents; Oaks publicly expressed her pleasure at the selection—"Claire Oaks Selected 'Woman of the Year' "; *Eastern Shore Courier* (January 14, 1980); *see also* "Reflections On The Bay—Radio Waves and I De-Claire," *Eastern Shore Courier* (January 17, 1980). (Summary Judgment Exhibit 1 at 26, 28, 39, 45–46)

50. After moving to her new home in Flossmoor, Illinois, Oaks was profiled in two newspapers: "Flossmoor Library Hires 'Iron Magnolia'," *Homewood-Flossmoor Star* (February 17, 1980); and, "Censor's Foe Heads North," *Suburban Trib* (August 18, 1980). In the *Suburban Trib* article, Oaks acknowledged that it was "inevitable" that she would gain notoriety in Flossmoor as result of the "national media" attention she received in her Fairhope dispute, but that she was not sorry because of the importance of the case (Oaks at 182–183). (Summary Judgment Exhibit 1 at 48–49, 60)

51. The court previously addressed the "public controversy" (Stipes at 36) that surrounding Oaks tenure as librarian after May 25, 1979, and the speeches Oaks delivered in Dallas, Texas, and Mobile and Tuscaloosa, Alabama, during that period (Oaks at 169–172) (*See* ¶ 12 through ¶ 13). Oaks also actively solicited assistance from the American Civil Liberties Union and from the American Library Association prior to filing this action (Oaks at 160). Oaks' husband, Thomas Minder, her former professor at the University of Alabama School of Library Science, testified that Oaks' Fairhope dispute was even mentioned at an international meeting in Denmark (Minder at 6, 42, 70–71). The Oaks dispute was apparently so heated that Minder wrote a

17. A volume of newspaper and magazine articles published *after* May 25, 1979, by and about Oaks are attached as an Exhibit to the motion for summary judgment. *See* Rule 902(6), *Federal Rules of Evidence.* The news articles were considered by the court, not to establish the truth of the matter asserted therein, but to demonstrate the fact of publication as bearing upon Oaks' status as a public figure. Oaks admitted that she granted interviews upon request (Oaks at 168–169).

letter to Oaks' replacement at the Library (like Oaks, a former Minder student) chastising her for taking the position, challenging both her competence and the ethics of her behavior, and suggesting she resign (Minder at 57–70, Exh. 2).

52. In the application for employment that Oaks sent to *all* prospective employers after her termination on September 30, 1979, Oaks expended considerable effort publicizing her dispute with the City of Fairhope. Indeed, Oaks enclosed with her employment application copies of *The New Yorker* and *Library Journal* articles about herself (Oaks at 184–188; Oaks Exh. 2).

53. The Oaks dispute was apparently such a hot topic of discussion in the summer of 1979 (Gaston at 53), that even in the summer of 1980 it was believed by Oaks' supporters that injection of the Oaks issue into the Fairhope City Council and Mayoral elections might help defeat the incumbent candidates. To that end, Oaks former legal adviser, Morris Ebenstein, obtained a copy of Oaks' complaint in this action for use in the campaign even before the complaint was served upon the defendants. Another former Oaks supporter wrote a letter to the editor for publication in local newspapers regarding the renewed litigation. (Ebenstein at 25, 78–79, 82–88, 25, 100; Dryer at 24–31; Bemis at 43–46; Bemis Deft. Exh. 1; Oaks at 166, 178–179; Nix at 102–104)

*Libel And Slander—Library Board Letter*

54. Oaks initially asserted a defamation claim against the Library Board based upon the letter which offered Oaks the opportunity to resign (Complaint ¶ 31b). The City of Fairhope filed a fully supported motion for summary judgment on the claim to which Oaks did not respond. Indeed, the Oaks Response to summary judgment apparently recognized that the Library Board letter is not defamatory:

> The ... Library Board members *never* charged that Ms. Oaks was anything less than a competent and efficient Librarian ... not even the letter of termination [sic] contends otherwise, unless the charge that [Oaks] seemed to require too large a staff and too large a budget could be construed as such.

(Oaks Response ¶ 32). Under Local Rule 8 of this court, Oaks apparently does not contend that there are issues of fact in connection with the claim.

55. Nonetheless, Oaks at least initially contended that the Library Board letter (Complaint Appendix C) supported a defamation claim and the court has fully considered that assertion.

56. The Library Board letter offered Oaks the opportunity to resign and stated reasons why her employment would not be continued beyond September 30, 1979. The Library Board letter was not maintained in Oaks' personnel file, nor was the letter distributed to any prospective employer (Bishop at 74–76). City Councilman Stipes testified that he was shown (but not given) a copy of the letter the night before the letter was delivered to Oaks (Stipes at 31–34). Stipes further testified that Mayor Nix made a statement to the effect that Nix had helped draft the letter (Stipes at 34).[18] Except for Stipes and Nix (each has been a defendant in both Oaks' lawsuits), the letter was not shown or delivered to anyone other than Oaks. Indeed, considerable care was taken to insure that Oaks alone was privy to the letter. (Bishop at 31–33; Shepherd at 55; Mason at 113–114; Bemis at 64)

57. The Library Board letter was prepared with the assistance of the attorney who negotiated the Settlement Agreement (Arendall). Bishop, Mason and Shepherd (the three Library Board signatories) discussed with attorney Arendall whether it was advisable to give Oaks a statement of reasons why a majority of the Library

18. Each Library Board member who signed the termination letter, denied that Nix assisted in its preparation (Bishop at 22, 31–33; Mason at 113–114; Shepherd at 48–49, 55). Nix also denied assisting in the preparation of the termination letter (Nix at 95–96). For the purpose of motion for summary judgment, however, the court must accept as true that both Stipes and Nix viewed the Library Board letter.

Board did not wish to continue her employment beyond September 30, 1979. In Library Board Chairman Bishop's words, it was concluded that we were "damned if [we did] and damned if [we didn't]." Although Library Board member Mason opposed a statement of reasons, the others concluded it would be "fairer" to Oaks to do so. (Bishop at 29–31; Mason at 76–77, 108)

58. Each Library Board member who signed the letter testified regarding the reasons stated in the letter. The three Library Board members did not necessarily subscribe to all of the cited reasons and the three members differed somewhat on the relative importance of the specified reasons. The three Library Board members, however, had a consensus opinion that the constant public complaints regarding Oaks' continued employment, the divided public opinion and the consequent disruption of the Library Board meetings were the primary reason. (Bishop at 52–68, 70–71, 76–77; Mason at 37, 48–49, 55–58, 91–96, 108–109; Shepherd at 26–29, 35–37, 47–51; *see* Bishop Affidavit Exh. C; *see* Finding of Fact ¶ 38)

59. The record is devoid of admissible evidence that the Library Board letter was prompted by malice or ill will, while substantial facts support the Library Board's cited reasons.[19] The contents of the letter were *never* made public by the Library Board, yet Oaks attached a copy of the letter to her Complaint in this action (a public record), and *authorized* her attorney in this action to give a copy of the Complaint and letter to a local political group in Fairhope (Ebenstein at 82–87). The letter was published in the *Eastern Shore Courier* before the defendants in this action were served with the Complaint (Nix at 102–103; Summary Judgment Exh. 1 at 54).

*Libel And Slander—Mayor Nix's Statements*

60. The second defamation alleged by Oaks is based upon two reported statements attributed to Mayor Nix in September 1979; i. e., after Oaks was notified of her termination (Complaint ¶ 45 and ¶ 46). Although Oaks would apparently charge each defendant with the statements attributed to Mayor Nix by virtue of an alleged conspiracy,[20] no facts support such a claim. No evidence supports a finding that any defendant other than Mayor Nix acquiesced in, or had knowledge of the statements. Indeed, Oaks *admits* that *no other defendant* made the allegedly defamatory statements (Oaks at 136–138).

61. The allegedly defamatory statements are from two interviews in which Mayor Nix participated: an interview with *Eastern Shore Courier* reporter Steve Hart and an interview with Associated Press reporter Gary Mitchell. The AP story was apparently carried on the wire service and was consequently republished in several newspapers (Oaks at 142).

62. The first article was published in an *Eastern Shore Courier* article entitled "Mayor Says Polygraph Test Proves His Point" (Nix Plt. Exh. 2). Oaks contends that two statements in the article are defamatory: the statement that Oaks was terminated the first time "because she was inefficient and not able to properly manage the library," and the statement that Oaks was terminated for "financially irresponsibility over a long period of time" (Complaint ¶ 45). The *Eastern Shore Courier* article states in pertinent part:

> Fairhope Mayor Jim Nix released the results from a polygraph test, this week,

19. Indeed, Oaks' own testimony that she was paid less than City department heads "who certainly had nothing like the amount of education that I had" is supportive of the statement in the Library Board letter that Oaks "seemed" to "disdain" many citizens as "common, uneducated and nonintellectual" (Oaks at 36; Complaint Appendix C).

20. It is unclear whether Oaks even contends that the "Nix statements" were part of the alleged conspiracy. Oaks complaint alleges and Oaks testified that there was a conspiracy "to terminate [Oaks]" (Complaint ¶¶ 41–43, ¶ 49; Oaks at 101). The Library Board voted to terminate Oaks on August 30, 1979; thus, the alleged conspiracy was complete *before* the purportedly defamatory statements attributed to Mayor Nix were made or published.

which support his contention that he never instructed Fairhope Public Librarian Claire Oaks to remove two controversial books from the library shelves.

* * * * * *

*Throughout the controversy, Oaks has claimed she was fired because she would not remove "Joy Of Sex" and "More Joy Of Sex", ... from the library shelves.* But Nix steadfastly denies ever threatening her with her job, and denies that he never told her to remove the books, he says the polygraph test is proof of his assertion.

* * * * * *

The results of the voice-stress polygraph test, taken last May 18, are contained in a letter addressed to the City of Fairhope and written by John E. Papis of Scientific Polygraph Consultants, Inc., of Mobile.

* * * * * *

*The polygraph* also *reflects* that Nix replied truthfully when he said "Ms. Oaks was fired because she was inefficient and was not able to properly manage the library."

According to the polygraph results, Nix answered truthfully when he denied instructing Oaks to remove the books; when he denied ever telling Oaks that the 1977–78 budget would be cut if she did not remove the books; and when he denied threatening to close the Library if the books were not removed.

* * * * * *

Mayor Nix says Oaks was fired originally, and again last week, because of financial "irresponsibility" over a long period of time.

* * * * * *

One thing is certain: had it not been for Oaks' suit, the issue of the books would not have become a central point of the controversy; and without the issue of the books, the National Press would probably have never focused its attention on the events in Fairhope.

*To this day, Oaks claims she was fired because of the books,* and because she would not go along with the wishes of the Mayor and the City Council. The Mayor claims she was fired because she was irresponsible with Library money and wanted too much money for herself and her staff.

(Nix Deposition Plt. Exh. 2; Nix Deposition Deft. Exh. 1) (emphasis supplied)

63. Mayor Nix testified regarding the circumstances under which the reported statements were made. As the newspaper article reflects, Oaks once again asserted that her termination was the result of the so called "dirty books" issue (Oaks at 174). Mayor Nix responded that "the book issue was a moot issue until Ms. Oaks brought it back up" (Nix at 73); Nix testified that the statement that Oaks "was fired because she was inefficient and not able to properly manage the Library" was quoted verbatim from the polygraph report that Nix produced for the reporter (Nix at 72–82; Nix Deposition Deft. Exh. 1).

64. Mayor Nix also testified that the only portion of the *Eastern Shore Courier* article that was inaccurate was the assertion that Oaks was fired originally "and again last week," because of financial irresponsibility over a long period of time. Mayor Nix testified that the reference to "financial irresponsibility" was solely in connection with Oaks' first termination (Nix at 76, 107, 108). In fact, the "again last week" language is not set forth as a direct quote. Mayor Nix further explained the reasons why the City of Fairhope took the position *at the time of the first termination* that Oaks was terminated for financial "irresponsibility" (Nix at 75–79).

65. The second basis of Oaks' defamation claim against Mayor Nix is the statement that Oaks "was inefficient and irresponsible with Library funds"; the statement appeared in the September 30, 1979, *Atlanta Constitution* article entitled "Librarian To Renew 'Dirty Book' Fight" and was also reprinted in other newspapers including the September 30, 1979, *Mobile Press Register* (Oaks at 138, 141–142, 173–176; Complaint ¶ 46; Nix Plt. Exh. 3). The context of the alleged defamatory statement is pertinent:

[Oaks] insists that those books ["dirty books"] started her troubles with Mayor James Nix, the City Council, the Library Board, and ultimately ended Sunday [September 30] with her dismissal.

* * * * * *

The Mayor said the dirty books episode was a "total fabrication" on the librarian's part to call national attention to her plight.

* * * * * *

"Those books are not the issue and never have been," the Mayor protested . . .

(Nix Plt. Exh. 3). The article proceeds to detail the events surrounding Oaks' *first* termination and then continues with Mayor Nix's explanation why Oaks was fired the *first* time:

Nix said Miss Oaks was inefficient and irresponsible with library's funds, he cited those reasons for her dismissal.

(Nix Plt. Exh. 3). The Associated Press article continues with a discussion of Oaks' reinstatement following her first federal court suit and subsequent termination effective September 30, 1979:

What's at stake, Ms. Oaks said, is censorship and the right for citizens to decide what they want to read.

"There are very few censorship cases in the South because the librarians are the censors," [Oaks] said. "It should be the people suing the librarians for censoring their right to read."

(Nix Plt. Exh. 3). The article next addresses the reasons for Oaks' termination on September 30, 1979 (as opposed to Oaks' *first* termination), and specifically states that those reasons were set forth in a Library Board letter *which was not made public.*

66. Oaks testified in regard to her interview with the Associated Press writer that resulted in the AP article ("Librarian To Renew Dirty Book Fight"). Oaks stated that the interview transpired *after* she was "fired the second time" and she admitted resurrecting the "censorship issue" (Oaks at 173–176):

I think that was the thrust of the whole, the whole interview, that this had started with the censorship issue and I felt that it was a continuation of the censorship issue.

(Oaks at 174). The statement is somewhat curious in view of Oaks' admission that there was no censorship at the Library after her reinstatement on May 25, 1979 (Oaks at 174).

67. Mayor Nix testified that he also participated in an interview with the Associated Press writer (Nix at 109–115). Mayor Nix had previously stated that the "book issue was moot until Ms. Oaks brought it back up" and he reiterated that he did not comment on Oaks' second termination; the statement that Oaks was "inefficient and irresponsible with library funds" related exclusively to the reasons for her first termination (i. e., before May 25, 1979) (Nix at 73, 110). Nix further related the facts supporting the position taken by the City of Fairhope at the time of Oaks' first termination (Nix at 110, 75–79). The Mayor's cited reason for the first termination corresponded with the position taken by the City of Fairhope in the first lawsuit. An article appearing in the *Mobile Press Register* on May 25, 1979, entitled "Fired Librarian Fights For Job In U.S. Court" (Summary Judgment Exhibit 1 at 67) quoted the City of Fairhope defense attorney as follows: [21]

The defense attorney said the action abolishing the Library Board and termination of Oaks came because of "budgetary problems" and "fiscal irresponsibility" on the part of the Library Board and Ms. Oaks.

68. Mayor Nix testified that he considered all differences with Oaks reconciled as of the date of the Settlement Agreement

21. The quoted statement is not cited to prove the truth of the matter asserted therein; the statement is probative of the Mayor's motivation in responding to Oaks' resurrection of the so-called censorship issue. *See* Rule 801 and Rule 902(6), *Federal Rules of Evidence. See McCormick On Evidence* at 590–91 (2d ed. 1972); *Frank v. United States,* 220 F.2d 559 (10th Cir. 1955).

(Nix at 23). No facts support a finding that the Mayor's reported statements were other than a direct response to Oaks' resurrection of the "censorship" issue.

*The Individual Defendants*

69. Oaks apparently contends that each defendant should be included in all claims simply because Oaks has alleged a conspiracy. Oaks admits that she has no facts to support individual claims against Henry Bishop, Samuel E. Box, Jack A. Stipes, Billy Don Wiggins, Trisha Nelson and C. O. McCawley (Oaks at 76–79, 115–119, 136–138). Indeed, Henry Bishop (deceased) and Billy Don Wiggins resigned from the Fairhope City Council and had no connection with this case subsequent to Oaks' reinstatement on May 25, 1979 (Bishop Affidavit); Oaks now admits that summary judgment should be granted with respect to those two defendants (Oaks Response ¶ 57).

70. The sole factual basis of Oaks' claims against the individual City Council members is that he or she was a member of the City Council, attended City Council meetings and voted to keep the Library budget the same as it had been the year before (Oaks at 79, 116–121). No facts support either a claim against Henry Bishop, Samuel E. Box, Jack A. Stipes, Billy Don Wiggins, Trisha Nelson and C. O. McCawley or a finding that any such defendant participated in a conspiracy. The Oaks Response to summary judgment did not assert otherwise. Oaks' claims against each of the foregoing defendants are frivolous, groundless and utterly without foundation.

## CONCLUSIONS OF LAW

1. Oaks' Complaint initially asserted federal claims under 42 U.S.C. § 2000e–2 (sex discrimination in connection with her termination and her compensation), 42 U.S.C. § 2000e–3(a) (under both the "opposition clause" and the "participation clause"), the first amendment (denial of free speech, press and association, cognizable under 42 U.S.C. § 1983), 42 U.S.C. § 1985(2) (conspiracy to terminate Oaks *because* she filed a previous federal action), 42 U.S.C. § 1985(3) (a conspiracy to terminate Oaks because of her sex), and state law claims for defamation, breach of contract and the right to be free from *illegal* conspiracies. Oaks now *admits* that she has no claim against two individual defendants (Bishop and Wiggins), no defamation claim against the City of Fairhope, no claim under the "opposition clause" of the *Civil Rights Act of 1964*, no claim for denial of freedom of the press or freedom of speech, and no facts to support any claim against four other individual defendants who were subjected to suit in federal court because they served as members of the Fairhope City Council. Furthermore, Oaks has apparently abandoned her defamation claim against the Library Board and has abandoned or modified her "theories" in support of other claims. This court has, however, fully considered the record in light of *all* claims asserted in the Complaint.

2. As appears more fully, the court is without jurisdiction over the claims under 42 U.S.C. § 2000e *et seq.* The court has jurisdiction over the claims cognizable under 42 U.S.C. § 1983 and § 1985 by virtue of 28 U.S.C. § 1343. This court also has jurisdiction over the state law claims by virtue of 28 U.S.C. § 1332. The amount in controversy exceeds the sum of $10,000 exclusive of interest and costs.

3. Oaks did not timely substitute the estate of Henry G. Bishop as a party defendant as required by Rule 25, *Federal Rules of Civil Procedure.* This action is admittedly due to be dismissed in its entirety as to Henry G. Bishop.

*Settlement Agreement*

4. Based upon the Settlement Agreement and the dismissal of Oaks' first Complaint with prejudice, the City of Fairhope moved the court to strike all allegations of fact arising prior to May 25, 1979, and sought dismissal of each claim based exclusively upon such facts. The City of Fairhope further moved that the court dismiss other claims as insufficient as a matter of law.

5. On October 15, 1980, this court entered an Order upholding the Settlement Agreement as a matter of law. Consequently, the court granted the motion to strike all factual allegations predating May 25, 1979. The court further dismissed the claims based upon Oaks' purported contract of employment; i. e., the breach of contract and property interest claims, as well as the claim for deprivation of a "liberty" interest under the fourteenth amendment. The Order of this court did not adjudicate all Oaks' claims and therefore is subject to revision before the entry of a judgment adjudicating all claims. *See* Rule 54(b), *Federal Rules of Civil Procedure.* Accordingly, this court has made a final adjudication of such claims herein.

6. Under Rule 12(f), *Federal Rules of Civil Procedure,* this court may order stricken from the Complaint "immaterial" or "impertinent" matter. This court has the obvious power to strike from the pleadings as "immaterial" any matter having no value in developing the issues of the case. 2A, *Moore's Federal Practice* ¶ 12.21[1] at 2420 (2d ed. 1979). "Impertinence" consists of any allegation "not relevant" to the issues "involved in the action and which could not be put in issue or be given in evidence between the parties." 2A, *Moore's Federal Practice, supra,* at 2421–25; *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887 (2d Cir. 1976). *See also Narragansett Tribe of Indians v. Southern R. I. Land Devel.,* 418 F.Supp. 798, 801–02 (D.R.I.1976). The Settlement Agreement between the parties specifically provided:

> In the event [Oaks] should assert or attempt to assert any claimed cause of action or demand of any kind whatsoever against any person or persons or entity whatsoever on account of the receipt of notice of termination of her employment as of September 30, 1979, nothing said, done, or occurring prior to May 25, 1979, shall be admissible in evidence in any proceeding brought in connection therewith, nor in anywise relevant thereto.

Complaint, Appendix B. If the Settlement Agreement is upheld, it is clear that the allegations of fact arising prior to May 25, 1979, are impertinent and immaterial.

7. Settlement agreements are highly favored by the courts as an amicable method of resolving disputes and promoting judicial economy. *Williams v. First National Bank,* 216 U.S. 582, 592, 30 S.Ct. 441, 444, 54 L.Ed. 625 (1910); *Miller v. Republic National Life Insurance Company,* 559 F.2d 426, 428 (5th Cir. 1977); *Maddox v. Druid City Hospital Board,* 357 So.2d 974, 975 (Ala.1978). Such agreements are binding and enforceable contracts and are to be construed as a matter of contract interpretation; both parties agree that construction of the Settlement Agreement in the instant case is a question of law for the court. *Eaton v. Courtaulds of North America, Inc.,* 578 F.2d 87 (5th Cir. 1978); *First National Bank of Miami v. Insurance Co. of North America,* 495 F.2d 519 (5th Cir. 1974); *C. Wright & A. Miller Federal Practice & Procedure*: Civil ¶ 2588; *Brocato v. Brocato,* 332 So.2d 722, 724 (Ala.1976). The language of a settlement agreement must be construed in a straightforward manner. *Robin v. Sun Oil Co.,* 548 F.2d 554, 557 (5th Cir. 1977); *Matter of Robertson Class Plaintiffs,* 479 F.Supp. 657, 668–69 (S.D.N.Y. 1979). Furthermore, actions that transpire before the execution of a settlement agreement cannot constitute a breach of the agreement. *Gulf Oil Corp. v. Mobile Drilling Barge or Vessel,* 441 F.Supp. 1, 4 (E.D. La.1975), *aff'd,* 565 F.2d 958 (5th Cir. 1978).

8. Generally, the substantive law of Alabama governs the interpretation and effect of the Settlement Agreement. *See generally,* 15A Am.Jur.2d *Compromise and Settlement* (1976). In Alabama the substantive law of settlement agreements is well established. "When parties who are *sui juris* make a final settlement between themselves, such settlement is as binding on them in many respects as a decree of a court. Such an agreement may only be opened for fraud, accident, or mistake." *Burks v. Parker,* 192 Ala. 250, 68 So. 271, 272 (1915), *citing, Scheuer v. Berringer,* 102 Ala. 216, 14 So. 640 (1894); *Brocato v. Brocato,* 332 So.2d 722, 723–24 (Ala.1976);

*O'Rear v. Sutton*, 215 Ala. 630, 112 So. 159 (1927); *Nero v. Chastang*, 358 So.2d 740, 741, 743 (Ala.Civ.App.1978). No matter how unjust one party may later come to regard the settlement, if it is free from fraud, it cannot be attacked. Likewise, if subsequent developments do not meet the expectations of the settling party, the settlement is not open to collateral attack. *Western Grain Company Cases*, 264 Ala. 145, 85 So.2d 395, 414 (1955).

9. The Settlement Agreement in this action settled various civil rights claims asserted by Oaks in her first federal court action. Although the court has looked to Alabama law in construing the Settlement Agreement, it is clear that Alabama law is not inconsistent with the Constitution and laws of the United States insofar as construction of the Settlement Agreement is concerned. *See* 42 U.S.C. § 1988; *Eaton v. Courtaulds of North America, Inc.*, 578 F.2d 87, 90–91 (5th Cir. 1978); *Wise v. Braniff Airways, Inc.*, 622 F.2d 738 (5th Cir. 1980). Although *Eaton* and *Wise* are cases arising under federal law, the principles regarding interpretation of a settlement agreement are completely consistent with Alabama law.

10. Oaks would avoid her negotiated Settlement Agreement based upon allegations that the City of Fairhope violated the agreement; Oaks would thus reassert each claim and relitigate all factual allegations previously asserted in her settled first action. The alleged "violations" of the Settlement Agreement, however, are based exclusively upon a strained interpretation of the agreement. Oaks proffers four purported "violations," of the Settlement Agreement:

(a) Oaks construes paragraph 1 of the Settlement Agreement to include an implied duty to proceed in good faith to establish a long term relationship between Oaks and the Library Board.

(b) Oaks construes paragraph 4 and paragraph 6 of the Settlement Agreement to preclude a statement of the reasons for her termination on September 30, 1979.

(c) Oaks construes paragraph 6 of the Settlement Agreement, which reserves

claims for violation of federally protected rights after the date of the Settlement Agreement, as a ground for avoiding the entire Settlement Agreement.

(d) Oaks construes paragraph 7 of the Settlement Agreement as requiring the Library Board to negotiate the terms and conditions of Oaks continued employment *after* September 30, 1979.

(a) *Implied Duty To Proceed In Good Faith To Establish A Lasting Relationship.*

Although Oaks nominally contends that the defendants entered into the Settlement Agreement fraudulently or in bad faith, Oaks admits that the purported bad faith rests exclusively upon an implied duty "to establish a lasting relationship with Oaks *after* the Settlement Agreement" (Complaint ¶ 31a). Oaks contends that the defendants entered the Settlement Agreement with no intention of fulfilling that implied duty, but rather intended from the outset to terminate Oaks' employment on September 30, 1979. The proffered implied contractual duty is based upon paragraph 1 of the Settlement Agreement:

> *This Settlement Agreement* is entered into by the parties to adjust all of their differences and to effect a reconciliation for the best interest of the City of Fairhope, its citizens, its Library Board, and the parties.

(emphasis supplied) The language merely recites the purpose of the Settlement Agreement itself. The Settlement Agreement did "adjust all of the differences" between the parties. A disputed Library Board was reconstituted (Settlement Agreement ¶ 2), a disputed contract was rescinded (Settlement Agreement ¶ 3), Oaks was reinstated as director of the Library (Settlement Agreement ¶ 4), the amount of Oaks' compensation and backpay was agreed upon (Settlement Agreement ¶ 5), Oaks' court costs, including her attorney's fees, were paid by the City of Fairhope (Settlement Agreement ¶ 9) and the first Complaint was dismissed with prejudice (Settlement Agreement ¶ 10). Each de-

fendant who testified regarding the Settlement Agreement, stated that at the time the agreement was executed a reconciliation was achieved (Nix at 23; Stipes at 9; Bishop at 12; Shepherd at 24; Mason at 27–29).

11. Unless the defendants entered the Settlement Agreement with the intention of violating its *express* terms, Oaks cannot establish the fraud or bad faith required to avoid the agreement. Alabama courts have never read into a settlement agreement an implied promise on the part of a settling party to continue negotiations after the settlement. Settling parties who deal at arm's length to compromise a lawsuit are not required to perform beyond the literal terms of the Settlement Agreement. A settling party who wants a settlement agreement performed beyond its express terms is free to bargain for that promise in reaching the compromise. "The value [of a settlement agreement] consists in the release of an uncertain position, with its anxieties, and from the inevitable expenses and trouble." *Western Grain Company Cases*, 264 Ala. 145, 85 So.2d 395, 414 (1955). The Settlement Agreement was executed by counsel for Oaks; the court notes that Oaks' counsel is experienced in civil rights matters and was well able to negotiate a settlement agreement which *expressed* the full agreement of the parties.

(b) *Statement Of Reasons For Termination.*

Oaks would construe paragraphs 4 and 6 of the Settlement Agreement to *preclude* absolutely a statement of the reasons for her termination; Oaks thus contends that the Library Board letter specifying reasons (Complaint, Appendix C) was a breach of that obligation. Paragraph 4 of the Settlement Agreement, however, merely afforded the Library Board the right to terminate Oaks' employment on September 30, 1979, by giving written notice of such termination. Paragraph 6 afforded the Library Board the right to effect such termination without a statement of the reasons for doing so:

> [T]he Library Board *shall not be required* to show cause on September 30, 1979, if they elect to terminate [Oaks] employment as director of the library.

The language certainly does not prohibit a statement of the reasons for Oaks' termination. The decision of the Library Board to privately submit a statement of the reasons that Oaks' employment would not be continued certainly affords no basis for avoiding the Settlement Agreement.

(c) *Reservation Of Future Claims For Violation Of Civil Rights.*

Oaks' contends that alleged civil rights violations arising *after* the date of the Settlement Agreement, afford grounds for avoiding the Settlement Agreement entirely. Paragraph 6 of the Settlement Agreement provides:

> [The Library Board] may not terminate Oaks' services for reasons which would violate her federally protected constitutional and legal rights insofar as such rights have been violated after the date of this Settlement Agreement.

The provision simply states what the law would require in the absence of the express provision in the Settlement Agreement; i. e., that civil rights violations postdating the Settlement Agreement (May 25, 1979) cannot be waived prospectively. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52, 94 S.Ct. 1011, 1021, 32 L.Ed.2d 147 (1974); *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 858 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). Oaks' reservation of future claims does not justify avoiding the Settlement Agreement. Such a construction would render all civil rights settlements virtually nugatory by permitting endless relitigation of settled matters.[22]

22. The courts are unanimous in agreement that an employee may not accept the benefits of a settlement agreement while at the same time repudiating its provisions. *Wilson v. Woodward Iron Co.*, 362 F.Supp. 886 (N.D.Ala.1973); *Strozier v. General Motors Corp.*, 442 F.Supp. 475, 481 (N.D.Ga.1977). Nothing in the record suggests that Oaks has offered to return the

(d) *Duty To Negotiate Terms And Conditions Of Employment After September 30, 1979.*

Oaks finally suggests that paragraph 7 of the Settlement Agreement obligated the Library Board to negotiate the terms and conditions of Oaks' continued employment *beyond* September 30, 1979. Paragraph 7 of the Settlement Agreement merely provides:

> *In the event* [Oaks'] employment is continued after September 30, 1979, the terms and conditions of such employment shall be as may be mutually agreed upon by [Oaks] and the Library Board.

Oaks' continued employment beyond September 30, 1979, was thus a condition precedent to the negotiation of future terms and conditions of employment. Oaks' employment was not continued after September 30, 1979; Oaks was terminated effective September 30, 1979, as permitted by the *express* terms of the Settlement Agreement. Under such circumstances, no construction of the Settlement Agreement would impose an obligation to negotiate the terms and conditions of nonexisting employment.

*Title VII Of The Civil Rights Act Of 1964—Oaks' "Employer"*

12. To establish a claim under Title VII, Oaks must establish that she was subjected to discrimination by an "employer" as defined in 42 U.S.C. § 2000e(a) and § 2000e(b):

> [An] "employer" is a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person.

Oaks was employed by the Library Board. It is undisputed that the Library Board has never employed fifteen or more employees.

13. Although Oaks concedes that she was employed by the Library Board, she contends that the Library is a "department" or "agency" of the City of Fairhope and that the Fairhope City Council effectively controlled the Library by virtue of its budgetary control; i. e., the authority to approve or reduce the amount requested from the City in the budget submitted by the Library Board. Oaks thus contends that the City of Fairhope is her "employer" and that the City of Fairhope and the Library Board jointly employ more than fifteen employees. *See* B. Schlei & P. Grossman, *Employment Discrimination Law* 846 (1976) (hereafter *cited* as *"Employment Discrimination Law"*). The facts conclusively demonstrate, however, that the Library Board and the City of Fairhope were not "joint employers."

14. The primary test whether separate entities such as the Library Board and the City of Fairhope are joint employers is whether the entities jointly exercise "indicia of control" over the employee's employment. *See EEOC Compliance Manual* § 201(d), *citing Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964). "Indicia of control" has been defined by a leading treatise as:

> the authority to hire, transfer, promote, discipline or discharge; the authority to establish work schedules or direct work assignments; the obligation to pay or the duty to train the charging party.

*Employment Discrimination Law* at 848. Under these factors, the City of Fairhope possessed no indicia of control *vis-a-vis* Oaks; only the Library Board exercised such control. Indeed, Alabama law vests "full power and authority" over such matters in the Library Board. *See Code of Ala.* 1975, § 11–90–3.

15. In *Baker v. Stuart Broadcasting Co.,* 560 F.2d 389 (8th Cir. 1977), the court adopted the federal labor law doctrine on joint employer status in resolving a joint employer issue under Title VII. The court adopted the four factors promulgated by the National Labor Relations Board for determining whether consolidation of separate entities is proper:

> (1) interrelation of operations;

benefits she received under the Settlement Agreement, including payment of $6,000 to her attorney in this action as attorney's fees in the *first* lawsuit.

(2) common management;

(3) centralized control of labor relations; and,

(4) common ownership or financial control.

*Baker,* 560 F.2d at 392. District courts within this circuit have employed the four-factor *Baker* analysis in determining joint employer status. *Ingber v. Ramada Inns, Inc.,* 20 F.E.P. 1006, 1007 (U.S.D.C. N.D.Ga. 1979); *Carter v. Shop Rite Foods, Inc.,* 470 F.Supp. 1150, 1160 (N.D.Tex.1979); *McLendon v. Continental Trailways, Inc.,* 18 F.E.P. 1698, 1702 (U.S.D.C. N.D.Tex.1978); *EEOC v. Upjohn Corp.,* 445 F.Supp. 635, 638–39 (N.D.Ga.1977). Without specifically mentioning the four-prong test, the Fifth Circuit recently cited *Baker* with approval in *Quijano v. University Federal Credit Union,* 617 F.2d 129, 131 (5th Cir. 1980). In *Dumas v. Town of Mt. Vernon, Alabama,* 612 F.2d 974 (5th Cir. 1980), the Fifth Circuit cited the four factors and addressed the joint-employer question:

> We decline to apply this theory to hold that the town and the state or county, or all three, are a "single employer."

612 F.2d at 980 n.9. Whether the court applies the four *Baker* factors or undertakes a more general factual analysis, the ultimate conclusion is the same—the City of Fairhope and the Library Board are not joint employers.

16. Oaks contends that the "Library Board is an agency of the City of Fairhope" and that she was thus "an employee of the city, *regardless of the amount of control* the city council retained over the Library's day-to-day operations" (Oaks Response ¶ 7). Oaks further suggests that "a different test must be applied to a governmental employer than to joint private employers" (Oaks Response ¶ 9) and relies upon *Manley v. Mobile County,* 441 F.Supp. 1351 (S.D.Ala. 1977). *Manley* is certainly not inconsistent with this court's conclusion. In *Manley,* the court based its determination of joint employer status upon the fact that by statute the county was *required* to

> furnish the sheriff with the necessary quarters, books, stationery, office equipment, supplies, postage and other conveniences and equipment, including automobiles and necessary repairs, maintenance and all expenses incidental thereto, as are reasonably needed for the proper and efficient conduct of the affairs of the sheriff's office.

*Code of Ala.* 1975, § 36–22–18. In contrast to that obligatory statutory provision, *Code of Ala.* 1975, § 11–90–1 not only vests counties and cities with the *discretionary* power to establish and maintain libraries but also grants them broad power to support the library by whatever means they see fit, apart from county or city funds.

17. Oaks incorrectly suggests that the 1972 amendments to Title VII, which included governmental units within the definition of "person" under Title VII, require that a different test be applied to a *governmental* employer as opposed to a *private* employer. In *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), however, the Supreme Court dismissed the same argument advanced by Oaks:

> The relevant legislative history of the 1972 amendments extending Title VII to the States as employers does not, however, support such a result. Instead, Congress expressly indicated the intent that *the same Title VII principles be applied to governmental and private employers alike.*

433 U.S. at 331 n.14, 97 S.Ct. at 2728 n.14 (emphasis supplied). *Accord, United States v. City of Miami, Fla.,* 614 F.2d 1322, 1336 n.27 (5th Cir. 1980).

18. Oaks' contention that the Fairhope City Council effectively controls the Library Board by virtue of budgetary control is unavailing. Although the City Council passes upon that portion of the Library budget that requests an appropriation from the City of Fairhope, no City of Fairhope official has any control over how appropriated monies are actually expended by the Library Board. The City Council votes only on the bottom-line budget request, not on individual items. Perhaps most important, the City Council has absolutely no control

over Library employment practices and policies. The Library Board and the City of Fairhope are not joint employers of the librarian. The Library Board has never had fifteen or more employees and is therefore not an "employer" within the meaning of 42 U.S.C. § 2000e(b). Accordingly, the court lacks jurisdiction over the subject matter of Oaks' claims under Title VII of the *Civil Rights Act of 1964*.

*Sex Discrimination—Title VII and 42 U.S.C. § 1983 (fourteenth amendment)* [22a]

19. Although Oaks was terminated effective September 30, 1979, and replaced by another woman on October 1, 1979, Oaks would have this court hold that her termination was *because* of her sex. Oaks thus bases her termination claim upon disparate or discriminatory treatment:

> "Disparate treatment" ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others *because* of their ... sex.... Proof of discriminatory motive is critical, although it can *in some situations be inferred from the mere fact of differences in* treatment.

*Teamsters v. United States,* 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977) (emphasis supplied). *See Employment Discrimination Law* (1979 Supplement) at 5; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1971). Under either Title VII or the fourteenth amendment, in order to establish sex discrimination based upon disparate treatment, proof of discriminatory motive or intent is essential. *Teamsters v. United States, supra; Whiting v. Jackson State Univ.,* 616 F.2d 116, 121 (5th Cir. 1980) (when a fourteenth amendment claim under 42 U.S.C. § 1983 is utilized as a parallel remedy with Title VII, the elements are the same).[23] In *Personnel Adm. of Mass. v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979), the Supreme Court defined "discriminatory purpose" in a case under the fourteenth amendment:

> "Discriminatory purpose," ... implies more than intent as volition or intent as awareness of consequences. [citation omitted] It implies that the decisionmaker ... selected ... a particular course of action at least in part "because of," not merely "in spite of," its adverse effects on an identifiable group.

Oaks must therefore demonstrate that her termination was "because of" her sex. Absent direct or circumstantial evidence that sex discrimination was a motivating factor in her termination, Oaks could raise an "inference of discrimination" by establishing a *prima facie* case as outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* — U.S. —, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In *Burdine,* the Supreme Court summarized the requirements of a *prima facie* case:

> The plaintiff must prove by a preponderance of the evidence that she applied for an available position, for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination. The *prima facie* case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for plaintiffs' rejection. [citation omitted] As the

22a. Oaks has alleged sex discrimination and retaliation claims under Title VII (Complaint ¶¶ 33–35). The court must consider the substance of such claims because Oaks has proffered alternative theories (fourteenth amendment and 42 U.S.C. § 1985) in support of each. Although the court has concluded that the Library Board is not an "employer" for the purpose of Title VII, the court has fully addressed Oaks' Title VII claims. The following Conclusions of Law afford independent and alternative grounds for rejecting such claims.

23. Although Oaks need not establish that her sex was the *sole* factor for the adverse employment action, *see Garcia v. Gloor,* 618 F.2d 264, 268 (5th Cir. 1980), the City of Fairhope is not required to prove the absence of discriminatory motive. *Board of Trustees v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Whiting v. Jackson State Univ.,* 616 F.2d 116, 121 (5th Cir. 1980).

court explained in *Furnco Construction Co. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), the *prima facie* case "raises an inference of discrimination only because we presumed these acts, if otherwise unexplained, are more likely than not based upon consideration of impermissible factors."

Oaks' termination and prompt replacement by another woman hardly raises "an inference of discrimination" that, if unexplained, would demonstrate that her termination more likely than not was based upon her sex.[24] Oaks has failed to raise an "inference of discrimination" in connection with her termination and has thus failed to establish a *prima facie* case of sex discrimination. *See Marks v. Pratto, Inc.*, 607 F.2d 1153, 1155 (5th Cir. 1979); *Burdine v. Texas Dept. of Community Affairs*, 608 F.2d 563, 568 (5th Cir. 1979), *rev'd on other grounds*, — U.S. —, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Flower v. Crouch-Walker Corp.*, 552 F.2d 1277 (7th Cir. 1977).

20. Oaks may, of course, adduce either direct or circumstantial evidence that her termination was because she was a woman. *See Teamsters v. United States, supra.* In response to summary judgment, Oaks proffered purported "direct evidence from which sex-related motives on the part of the [City of Fairhope] may be inferred" (Oaks Response ¶ 17). Oaks relies primarily on the incidents demonstrating what she characterized as an "attitude of sex discrimination or the attitude of antagonism toward [Oaks]" (Oaks at 35). Oaks' interpretation of the incidents simply does not demonstrate that her termination was because of her sex. *See Gatling v. Atlantic Richfield Co.*, 577 F.2d 185, 188 (2d Cir. 1978) (on summary judgment, plaintiff's interpretation of undisputed fact insufficient). Indeed, Oaks' own testimony is that the incidents occurred "because I was who I was" (Oaks at 74). The court has fully considered the record, including the purported direct evidence of sex discrimination cited by Oaks, and concludes that Oaks has failed to raise an issue of fact that her termination was because of her sex.

21. Even if Oaks could adduce sufficient facts to establish a *prima facie* case of sex discrimination in connection with her termination, the Library Board articulated legitimate, nondiscriminatory reasons for Oaks termination (See Finding of Fact ¶ 38):

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons.
>
> * * * * * *
>
> We have stated consistently that the employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which will allow the trier of fact rationally to conclude that the employment decision has not been motivated by discriminatory animus.

*Texas Dept. of Comm. Affairs v. Burdine*, — U.S. —, 101 S.Ct. 1089, 1094, 1096, 67 L.Ed.2d 207 (1981). No facts in the record support a finding that the articulated reasons are a pretext for sex discrimination.

22. Oaks' alternative sex discrimination theory is somewhat more complex and imaginative. Oaks apparently contends that she was terminated because she possessed characteristics that were intolerable

24. Oaks relies upon the rote recitation of the fourth factor of a *prima facie* case in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Oaks contends that, although she was replaced by another woman, she has established a *prima facie* case because the librarian's position "remained vacant after her termination, during which time [her] employer sought applications" (Oaks Response ¶ 15). It is undisputed, however, that the Library Board voted not to continue Oaks' employment effective September 30, 1979, and that Oaks was replaced as librarian by another woman on October 1, 1979 (Bishop at 51; Gaston at 23–26; Settlement Agreement ¶ 4; Shelley Affidavit ¶ 2).

in a woman but that would have been tolerated in a hypothetical male librarian; i. e., a "sex plus" theory of discrimination:

> The "sex plus" cases stand for the proposition that an employer's use of an ostensibly neutral factor to disadvantage women but not men is sex discrimination.

*Jeffries v. Harris Cty. Community Action Ass'n*, 615 F.2d 1025, 1035 n.7 (5th Cir. 1980). *See also Harper v. Thiokol Chemical Corp.*, 619 F.2d 489, 492 (5th Cir. 1980). The theoretical difficulty with this approach, however, is that courts have held the "neutral factor" in "sex plus" must be an "immutable or protected characteristic." *Willingham v. Macon Tel. Publishing Co.*, 507 F.2d 1084, 1092 (5th Cir. 1975). Oaks' testimony that she was considered an "uppity woman" (apparently a personality or character trait of aggressiveness, assertiveness or tenacity on the part of a woman in business or professional dealings) and that a hypothetical male librarian possessing similar characteristics would have fared better (Oaks at 74–75), is simply insufficient. Furthermore, no facts support a finding that a male possessing similar characteristics would have been treated differently. Oaks' claim is thus factually and legally insufficient.

23. On a second level, Oaks maintains that she was subjected to sex discrimination because her salary was "substantially less" than that of "similarly situated department heads in the City of Fairhope." The claim presupposes that the Library Board is a department of the City of Fairhope (Oaks at 83), a premise the court has previously rejected. Even if the claim is independently considered, however, it is without foundation.

24. Title VII makes it unlawful for an employer to discriminate against any individual with respect to compensation because of such individual's sex. 42 U.S.C. § 2000e–2(a). The sex discrimination provision of Title VII must be construed in harmony with the *Equal Pay Act of 1963*, 29 U.S.C. § 206(d). *Hodgson v. Brookhaven General Hospital*, 436 F.2d 719 (5th Cir. 1970); *Ammons v. ZIA Co.*, 448 F.2d 117 (10th Cir. 1971); *Orr v. Frank R. MacNeill & Son, Inc.*, 511 F.2d 166, 170–171 (5th Cir. 1975), *cert. denied*, 423 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94 (1975). The Fifth Circuit has detailed the plaintiff's burden of proof under a Title VII equal pay claim as follows:

> To establish a case under Title VII it must be proved that a wage differential was based upon sex and that there was the performance of equal work for unequal compensation. *Ammons v. ZIA Co.*, [448 F.2d 117 (10th Cir. 1975).]
>
> The jobs in question need not be identical, but they must be substantially equal. *Brennan v. J. M. Fields, Inc.*, 5th Cir. 1974, 488 F.2d 443; *Hodgson v. Corning Glass Works*, 2d Cir. 1973, 474 F.2d 226; *Hodgson v. Fairmont Supply Co.*, 4th Cir. 1972, 454 F.2d 490; *Ammons v. ZIA Co., supra.* This court has recently said:
>
> > When Congress enacted the Equal Pay Act, it substituted the word "equal" for "comparable" to show that "the jobs involved should be virtually identical, that is, they would be very much alike or closely related to each other." *Brennan v. City Stores, Inc.*, 5th Cir. 1973, 479 F.2d 235.

*Orr v. Frank R. MacNeill & Son, Inc.*, 511 F.2d 166, 171 (5th Cir. 1975). *Accord, Burdine v. Texas Dept. of Community Affairs*, 608 F.2d 563, 569 (5th Cir. 1979), *rev'd on other grounds*, — U.S. —, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

25. Under any accepted judicial standard, Oaks' duties as director of the library cannot be deemed "substantially similar" to the duties of the various city department heads such as the chief of police, the electrical superintendent, the street superintendent or the water and sewer superintendent. The court has closely scrutinized the duties in fact performed; the duties of librarian are completely dissimilar from the duties of such city officials. The admonition of the Fifth Circuit in *Orr v. Frank R. MacNeill & Son, Inc.*, 511 F.2d 166, 171 (5th Cir. 1975) is equally applicable in the present case:

The duties [of the female employee and the male employees] were greatly dissimilar even though each was the manager of a department. This without more precludes the characterization of the performance of their jobs as equal work.

Oaks' testimony that she possessed more education and bore greater responsibility than City of Fairhope department heads (Oaks at 36, 41) is unavailing. This court is not willing "to engage in wholesale reevaluation of any employer's pay structure in order to enforce [its] own conceptions of economic worth." *Brennan v. Prince William Hosp. Corp.*, 503 F.2d 282, 285 (4th Cir. 1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed. 652 (1975).[25]

26. In opposition to motion for summary judgment, Oaks implicitly suggests that this court ignore the "duties" in fact performed and hold as a matter of law that "in terms of her education, training, size of budget and number of employees supervised, Ms. Oaks should have been entitled to a higher salary than several of the department heads" (Oaks Response ¶ 19). Oaks would have the court adopt a "comparable worth" theory to hold that the librarian's position, though not substantially similar to the department head positions, is of comparable value and that a pay differential is therefore impermissible (apparently both under Title VII and the fourteenth amendment). Oaks apparently contends that the librarian's position is undervalued because it has traditionally been filled by a woman. The Fifth Circuit has not accepted or expressly rejected the "comparable worth" approach. *See Burdine v. Texas Dept. of Community Affairs*, 608 F.2d 563, 569 n.14 (5th Cir. 1978), *rev'd on other grounds*, — U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In *Lemons v. City and County of Denver*, 620 F.2d 228 (10th Cir. 1980), however, the court considered and rejected a claim virtually identical to that asserted by Oaks:

> This type of disparity was not sought to be adjusted *by the Civil Rights Act, and is not within the equal protection clause.* The courts under existing authority cannot require the City within its employment to reassess the worth of services in each position in relation to all others, and to strike a new balance and relationship. Also, this cannot be done in total disregard of conditions in the community. The court in *Christensen v. State of Iowa*, 563 F.2d 353 (8th Cir.), said of this: "We do not interpret Title VII as requiring an employer to ignore the market in setting wage rates for genuinely different work classifications."

620 F.2d 228, 229 (emphasis supplied).

27. Oaks does not question that the facts are undisputed in connection with her so-called "comparable worth" theory, but suggests that summary judgment is "premature" because the Supreme Court has granted certiorari in *Gunther v. County of Washington*, 623 F.2d 1303 (9th Cir. 1980), *cert. granted*, — U.S. ——, 101 S.Ct. 352, 66 L.Ed.2d 213 (1980).[26] Even if this court were to adopt a "comparable worth" approach, however, the undisputed facts in this case would not permit Oaks to prevail. This court cannot conclude that the librarian's position is comparable to that of city department heads who oversee the provision of essential services to the populace of Fairhope. The services provided by the library, no matter how desirable, are not essential to the daily life of the city as are

25. Nor can Oaks prevail by asserting that she was paid less as librarian than a hypothetical male *would have been* as librarian. *See Rinkel v. Associated Pipeline Contractors, Inc.*, 17 F.E.P. 224 (D.Alaska 1978). Suffice to say, there is no evidence that a male librarian would have been paid more than Oaks was paid.

26. In oral argument before the Supreme Court in *Gunther*, counsel for plaintiff/appellees' denied that her clients advocated, or that the Court of Appeals embraced, the replacement of the equal pay concept under Title VII with a "comparable worth" theory. Plaintiffs' counsel readily conceded that a Title VII plaintiff cannot establish a *prima facie* case of sex discrimination solely by alleging that the requirements of her job are comparable to those of another job occupied by a man. "Arguments Before The Court," 49 U.S.L.W. 3751 (April 14, 1981). Given the Court's constitutional reluctance to issue advisory opinions, *Gunther* may well be less than dispositive in connection with the "comparable worth" theory.

the operations of the police and the departments that provide electricity, water, street maintenance and sewage treatment. No theory of sex discrimination would value municipal services based solely on educational level, as Oaks would have it.

*Opposition To Sex Discrimination*

28. In order to establish a violation of 42 U.S.C. § 2000e–3, Oaks must allege: *first*, that she *opposed* practices made unlawful under Title VII or *participated* in protected activity under Title VII; *second*, that she was subjected to an adverse employment action; and, *third*, that there was a causal connection between the participation/opposition and the adverse employment action. *Employment Discrimination Law* at 417; *Whatley v. Metropolitan Atlanta Rapid Transit*, 632 F.2d 1325, 1328 (5th Cir. 1980); *Oshiver v. Court of Common Pleas*, 469 F.Supp. 645, 649 (E.D. Pa.1979). Oaks admitted that after May 25, 1979, she made *no* attempts to vindicate her federally protected right to be free from sex discrimination (Oaks at 90–91). Absent opposition to practices made unlawful under Title VII, Oaks "opposition clause" claim is fatally defective.

*Retaliation*

29. Oaks asserts alternative theories of retaliation under 42 U.S.C. § 2000e–3(a) ("participation clause") and 42 U.S.C. § 1985(2) (conspiracy to terminate *because* Oaks filed a previous federal action). Regardless of her theory of retaliation, Oaks must adduce evidence that raises a factual issue on the question of causation; i. e., that Oaks was terminated *because* she filed a previous federal lawsuit. *See Kimble v. D. J. McDuffy, Inc.*, 623 F.2d 1060 (5th Cir. 1980), *rehearing en banc granted*, 629 F.2d 1159 (5th Cir. 1980) (42 U.S.C. § 1985); *Smalley v. Eatonville, City of*, 640 F.2d 765, 769 (5th Cir. 1981) (Title VII); *Employment Discrimination Law* at 417.

30. By its terms, 42 U.S.C. § 2000e–3(a) forbids retaliation against an individual

> because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Subchapter VI, 42 U.S.C. § 2000e through § 2000e–17].

*See, e. g., Crawford v. Roadway Exp., Inc.*, 485 F.Supp. 914, 920 (W.D.La.1980). The purpose of the clause is, of course, to protect those who avail themselves of EEOC procedures thereby protecting EEOC processes. *See EEOC Compliance Manual* § 496.1; *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1005–07 (5th Cir. 1969) ("In unmistakable language [¶ 2000e–3(a)] is to protect the employee who utilizes the tool provided by Congress."). Oaks' first lawsuit did not contain a claim under Title VII, nor did Oaks complain to the EEOC prior to her termination. Consequently, her claim under 42 U.S.C. § 2000e–3(a) must fail. To the extent *Hicks v. ABT Associates, Inc.*, 572 F.2d 960, 968–69 (3d Cir. 1978), suggests a different result, this court does not agree.[27]

31. Oaks' retaliation claims under *both* Title VII and under 42 U.S.C. § 1985(2), fail on other grounds, as well. No admissible facts in the record demonstrate a *causal* connection between the first lawsuit and Oaks subsequent termination by the Library Board. Absent the essential causal connection, Oaks' claim necessarily must fail. The fact that a prior lawsuit was filed (a fact precluded by Settlement Agreement), standing *alone*, cannot establish a *prima facie* case.

*Employment Contract—Property Interest*

32. Oaks' *Third Federal Cause of Action* and her *Third State Cause of Action* are each based exclusively on a purported

27. The *Hicks* court expressly refrained from deciding whether non-Title VII proceedings are within the "participation clause." The *Hicks* court *dicta* relied upon by Oaks did not consider a plaintiff who *intentionally* by-passed EEOC proceedings in favor of court action. The Third Circuit subsequently narrowly construed *Hicks* in *Novotny v. Great American Federal Sav. & L. Ass'n*, 584 F.2d 1235 (3rd Cir. 1978), *vacated in part*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

contract of employment dated April 19, 1979, between the Library Board and Oaks (Complaint ¶ 37, ¶ 50, Appendix A). The court previously upheld the Settlement Agreement between the parties and dismissed each of the foregoing claims based upon paragraph 3 of the Settlement Agreement:

> The purported contract between the Library Board and [Oaks] dated April 19, 1979, is hereby rescinded.

Absent the employment contract, Oaks had no property interest in continued employment as director of the Library and her termination effective September 30, 1979, did not deprive Oaks of such an interest. *See United Steelworkers of America v. University of Alabama*, 599 F.2d 56, 60 (5th Cir. 1979); *Thompson v. Bass*, 616 F.2d 1259, 1264–65 (5th Cir. 1980).

*First Amendment Claims*

33. In response to motion for summary judgment, Oaks tacitly admits that her first amendment claim is appropriate for summary adjudication; Oaks does not even suggest that there is a genuine issue of material fact. Nonetheless, the court has independently scrutinized the record and concludes that there is no genuine issue of material fact. Oaks initially alleged that her termination infringed upon her first amendment rights of freedom of speech and freedom of the press. Oaks subsequently admitted on deposition not only that her freedom of press claim lacked factual support, but also that the specific factual allegations in support of her free speech claim (Complaint ¶ 38a through ¶ 38c) each pre-date the Settlement Agreement (Oaks at 98–99). Indeed, in response to summary judgment, Oaks seems to assert that she did not engage in any public or private expression whatsoever (Oaks Response ¶ 31);[28] Oaks does assert, however, that she has a first amendment claim grounded upon freedom of association.

34. It is axiomatic that a government or public employee cannot be discharged for properly exercising his or her first amendment rights. *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2684, 33 L.Ed.2d 570 (1972); *Hastings v. Bonner*, 578 F.2d 136, 141 (5th Cir. 1978). Where a public employee claims that adverse employment action is the result of an exercise of first amendment rights, a "balancing test" is applied to determine if the employer was justified in his actions inhibiting first amendment rights. *Schneider v. City of Atlanta*, 628 F.2d 915, 918 (5th Cir. 1980). The United States Supreme Court detailed the basis for this balancing test in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968):

> The problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern, and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35.

35. The Fifth Circuit has refined and applied the *Pickering* balancing test in numerous cases involving the discharge of public employees. According to the Fifth Circuit, a district court confronted with an allegation that an employee has been terminated in violation of first amendment rights, must engage in a "triparte inquiry." *Van Ooteghem v. Gray*, 628 F.2d 488, 491 (5th Cir. 1980). The three issues for consideration are:

> (1) Did the public employee engage in constitutionally protected first amendment activities;
>
> (2) Were the first amendment activities a "substantial" or "motivating" factor in her being dismissed; and,

28. The court notes that Oaks did in fact engage in public expressions. *See* Finding of Fact ¶ 13. No facts support a finding that such public expressions *per se* played any part in Oaks' termination. Oaks apparently does not contend otherwise.

(3) Would the employee have been fired, in the absence of her first amendment activities?

*See Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979). Consideration of the foregoing factors is for the court since "[a]pplication of the *Pickering* balance test is a question of law, *Schneider v. City of Atlanta,* 628 F.2d 915, 918 (5th Cir. 1980)." *Bickel v. Burkhart,* 632 F.2d 1251, 1256 (5th Cir. 1980).

36. The threshold consideration in applying the *Pickering* standards is whether Oaks' first amendment activities were constitutionally protected. The "time, manner and place" of the employee's first amendment activities constitute a key factor in the analysis. *Williams v. Board of Regents,* 629 F.2d 993 (5th Cir. 1980). The employer is certainly entitled to consider the effect of the activity or expression on work discipline and harmony, especially where the position calls for a large degree of personal loyalty. *Downing v. Williams,* 624 F.2d 612, 623 (5th Cir. 1980). Although the *disruptive effect* of the purported first amendment activity is not *controlling,* it is one consideration in the application of the *Pickering* standards. *See Porter v. Califano,* 592 F.2d 770, 773–74 (5th Cir. 1979).

37. It is undisputed that a harmonious relationship between the Library Board and the librarian is essential, particularly in connection with reviewing the Library budget for ultimate submission to the City Council. If Oaks' activities following the Settlement Agreement (*see* Findings of Fact ¶ 13) coupled with her "association" with persons who sought intentionally to disrupt Library Board meetings, destroyed that harmonious relationship, Oaks' activities were not protected by the first amendment:

> Where a [complainant], motivated by resentment, bitterness and self-aggrandizement, engages in disruptive conduct intentionally to undermine the authority of [her superiors], the speech accompanying such conduct is not constitutionally protected.

*Bickel v. Burkhart,* 632 F.2d 1251, 1257 (5th Cir. 1980). *See also Smalley v. City of Eatonville,* 640 F.2d 765 (5th Cir. 1981); *Floyd v. Alabama Historical Comm'n,* 388 So.2d 182 (Ala.1980).

38. This court need not decide, however, whether Oaks' *activities* fostered the disruption of Library Board meetings, nor need the court decide whether Oaks' voluntary "association" with persons who admittedly sought intentionally to disrupt Library Board meetings is constitutionally protected under the first amendment. The undisputed facts establish that Oaks would have been terminated even if she had not "associated with persons who opposed the political position of the defendants" (Oaks Response ¶ 27). In *Givhan v. Western Line Consol. School District,* 439 U.S. 410, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979), the Supreme Court held not only that the employee must establish that the first amendment activity played a "substantial" role in the employer's decision, but also that

> the employer is entitled to show "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." [*Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)].

Even if Oaks' association with disruptive elements played a substantial role in her termination (which presupposes that the association *is* constitutionally protected) the undisputed facts establish that Oaks would have been terminated absent such activity.

40. Under the Settlement Agreement, Oaks could be terminated for no cause and without a hearing or other proceeding. If the Settlement Agreement meant anything at all, it meant that *whether or not* Oaks did *anything* that constituted "cause" for termination, she could be terminated effective September 30, 1979. Whether or not Oaks assisted, "associated" or *even opposed* the "clique" causing the admitted disruption of Library Board meetings, the disruption and division in the community continued unabated after the Set-

tlement Agreement. Whether Oaks was a mere victim of circumstance or an instigator of Library Board meeting disruption, her termination did not implicate the first amendment. As Library Board member Shepherd testified:

> I really felt like—when this settlement was reached, I really felt like we were going to be able to restore the relationship that I had felt was in existence prior to this problem. And I had hoped that this would come to pass and that termination would not be necessary.... [T]hat's what I thought would happen and it didn't happen and the chasm was wider. Our community was divided, disturbed, disrupted in an increasing manner. It seemed that the problem had reached a magnitude that it would be better for her, as well as for the Library, the public in general, if a change in personnel came to pass.

(Shepherd at 47–48). Library Board Chairman Bishop echoed Shepherd's sentiment (Bishop at 65–66). The division and disruption in the community spilled over into the meetings of the Library Board and caused disruption of Library Board business. The disruptive element concentrated themselves around Oaks and "implicated" her into the problem; "whether Oaks did it consciously or unconsciously," the disruption persisted (Bishop at 65–66). Even if, in the opinion of the Library Board, Oaks *mere presence* caused the disruption, she could be terminated under the Settlement Agreement.[29]

41. Whether Oaks' mere presence, or her association with an identifiable clique, "consciously or unconsciously" caused the disruption of the Library Board meetings, it is undisputed that the "efficient operation" of the Library Board was adversely affected which in turn undermined the essential, harmonious working relationship between Oaks and the Library Board. Even if the Library Board *erroneously* concluded that Oaks' presence precipitated the disruption, her termination as result of the disruption would not be unlawful. *See, e. g., Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256 (5th Cir. 1977); *Jefferies v. Harris Cty. Community Action Ass'n*, 615 F.2d 1025, 1036 (5th Cir. 1980); *Corley v. Jackson Police Dept.*, 566 F.2d 994, 1003 n.14 (5th Cir. 1978). The undisputed facts, however, support the Library Board's conclusion. Whereas before and after the Oaks' controversy few, if any, people attended Library Board meetings, between May 25, 1979 and September 30, 1979, over a hundred people frequently were in attendance. The Library Board meetings during that time were characterized by loud, boisterous crowd behavior that disrupted the business of the Library Board. Library Board member Stevi Gaston, herself an Oaks' supporter, characterized the Library Board meetings as "rowdy" and further testified that there was "shouting." (Gaston at 39–42; Bishop at 17–20, 52–55, 61, 65–68, 70–71; Mason at 49–50, 61, 91–92, 108–109; Shepherd at 35–37, 48) Oaks' first amendment claim has practically run the gamut—from freedom of speech and press to freedom of association. Regardless of her efforts to fashion a legal theory to fit the undisputed facts, however, Oaks' termination in light of the admitted disruption of Library Board proceedings had no first amendment ramifications. The Library Board did no more than the Settlement Agreement permitted.

*Liberty Interest—Library Board Letter*

42. The court previously dismissed Oaks' alleged deprivation of a liberty interest under the fourteenth amendment (Complaint ¶ 40); the record fully supports the court's decision on that claim. The only factual allegation in support of the claim is the Library Board letter delivered to Oaks on

**29.** Oaks' reliance upon *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), is misplaced. In *Branti* the Supreme Court merely held that a public employee could not be discharged "solely because of his political beliefs." 100 S.Ct. at 1289. The Court did not sanction speech or association that resulted in disruption of the employer's business. No facts support Oaks assertion that her termination was the result of her mere association with persons who opposed the defendants' political opponents *divorced* from the accompanying disruption.

August 29, 1979, wherein the Library Board stated reasons why Oaks' employment would not be continued (Complaint Appendix C). An examination of the Library Board letter, the Settlement Agreement and the applicable law demonstrates that the due process claim is insufficient as a matter of law.

43. Although the Supreme Court has recognized that liberty interests protected by procedural due process of the fourteenth amendment may be involved in a public agency's decision to terminate an employee, *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972), an examination of the Library Board letter demonstrates that the letter lacked an essential element of a liberty interest claim—as a matter of law the letter was not "stigmatizing." *See Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *Blair v. Board of Regents*, 496 F.2d 322, 324 (6th Cir. 1974); *Adams v. Walker*, 492 F.2d 1003, 1008–09 (7th Cir. 1974) (unelaborated charge of "incompetence, neglect of duty, and malfeasance in office"); *Jeffries v. Turkey Run Consolidated School District*, 492 F.2d 1, 2 n.1 (7th Cir. 1974) ("highly unethical conduct"); *Clark v. Holmes*, 474 F.2d 928 (7th Cir. 1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *Russell v. Hodges*, 470 F.2d 212, 217 (2d Cir. 1972).[30]

44. Just as Oaks failed to demonstrate a stigmatizing effect in the Library Board letter, so has she failed to establish the essential element of "publication." *Bishop v. Wood*, 426 U.S. 341, 348–49, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1976); *James v. Board of School Com'rs*, 484 F.Supp. 705, 718 (S.D.Ala.1979); *Ventetuolo v. Burke*, 596 F.2d 476, 484 (1st Cir. 1979). The undisputed facts demonstrate that the Library Board letter was not made part of Oaks' permanent personnel file. No prospective employer received a copy of the letter. Indeed, other than the Library Board members, only a member of the City Council and the Mayor (both defendants in Oaks' first lawsuit) even arguably, saw a copy of the letter. Absent the possibility of publication by the Library Board to prospective employers, Oaks cannot assert that a liberty interest was impaired.

### *Conspiracy To Violate Federally Protected Rights*

45. Oaks has alleged a conspiracy to deprive her of federally protected rights; a claim cognizable under 42 U.S.C. § 1985(3). Title 42, U.S.C. § 1985(3), however, does not afford any substantive rights. *Great American Savings & Loan Assn. v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Thus, the § 1985(3) claim is exclusively derivative and must be based upon other alleged infringements of Oaks' federally protected rights.

46. Section 1985(3) does not afford a right of action based upon a denial of due process rights under the fourteenth amendment. *Whittington v. Johnston*, 201 F.2d 810 (5th Cir. 1953), *cert. denied*, 346 U.S. 867, 74 S.Ct. 103, 98 L.Ed. 377 (1953); *Brosten v. Scheeler*, 360 F.Supp. 608 (N.D.Ill. 1973), *aff'd*, 495 F.2d 1375 (7th Cir. 1974); *Perrotta v. Irizarry*, 430 F.Supp. 1274 (S.D. N.Y.1977), *aff'd* 573 F.2d 1294 (2d Cir. 1977). Oaks' Third and Sixth Federal Causes of Action based upon due process violations are, therefore, not cognizable under § 1985(3).

47. Likewise, allegations based upon denial of first amendment rights are not cognizable under 42 U.S.C. § 1985(3). *Arnold v. Tiffany*, 487 F.2d 216 (9th Cir. 1973), *cert. denied*, 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974); *Egan v. City of Aurora*, 291 F.2d 706, 707 (7th Cir. 1961);

30. In support of her claim that the Library Board letter was stigmatizing, Oaks alleged and testified that she was unable to obtain employment as a librarian "in her native south." Oaks accepted a position as director of the Flossmoor Public Library in Illinois. The existence of a stigmatizing effect, however, depends upon the "nature of the charge used for termination [contents of Library Board letter] and not the actual consequences of the charge." *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361, 365 (9th Cir. 1976). *See also Dennis v. S & S Consolidated Rural H. S. District*, 577 F.2d 338, 343 (5th Cir. 1978).

*Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) ("the language requiring intent to deprive of *equal* protection ... means that there must be some racial, or perhaps otherwise ... class-based, invidiously discriminatory animus behind the conspirators' action."). The Fourth Federal Cause of Action alleging denial of first amendment rights is therefore not cognizable under 42 U.S.C. § 1985(3).

48. Furthermore, alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, are not cognizable under § 1985(3). *Great American Savings & Loan Assn. v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). The First and Second Federal Causes of Action are based upon Title VII and are therefore not cognizable under 42 U.S.C. § 1985(3).

49. The only remaining federal right that would support a claim under § 1985(3) is that asserted in the Fifth Federal Cause of Action, i. e., that Oaks was subjected to sex discrimination in violation of the equal protection clause of the fourteenth amendment. This court has previously concluded that such claim is insufficient as a matter of law. Absent a substantive basis for a claim under 42 U.S.C. § 1985(3), Oaks' claim under that provision fails as well.[31]

*Defamation*

50. The threshold question in a defamation action concerns the status of the person allegedly defamed as a "public figure." *American Ben. Life Ins. Co. v. McIntyre*, 375 So.2d 239, 242 (Ala.1979). This is a question of law for the court. *Fulton v. Advertiser Co.*, 388 So.2d 533, 536 (Ala.1980), *cert. denied sub nom. Bronner v. Fulton*, —— U.S. ——, 101 S.Ct. 942, 67 L.Ed.2d 111 (1981).

51. A public figure is an individual who is not a public official but attains his or her "public figure status by thrusting [her] personality into the vortex of an important public controversy." *Brewer v. Memphis Pub. Co., Inc.*, 626 F.2d 1238, 1252 (5th Cir. 1980). *Accord, Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). *See* Note, *Public Figures, Private Figures and Public Interest*, 30 Stan.L.Rev. 157 (1977). Oaks clearly occupies the status of a public figure. By her own actions, she propelled herself into the limelight of public controversy, courted the attention of the press and public, and launched a campaign of activities across the country on her own behalf. Oaks could hardly be characterized as a private individual who was unwillingly dragged into a public controversy. *See Wolston v. Readers Digest Ass'n, Inc.*, 443 U.S. 57, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). Oaks admittedly granted press interviews upon request and the rash of newspaper articles that followed is further demonstrative of public figure status. *See Rebozo v. Washington Post Co.*, 637 F.2d 375, 379 (5th Cir. 1981).

52. A constitutional privilege is afforded individuals who allegedly defame public figures and *actual malice* must be pled and proved by the plaintiff. *American Ben. Life Ins. Co. v. McIntyre*, 375 So.2d 239, 243 (Ala.1979). To state a claim for defamation in Alabama, a public figure allegedly defamed must affirmatively allege actual malice. *Browning v. Birmingham News*, 348 So.2d 455, 458 (Ala.1977). Actual malice means that matter was published "with knowledge that [the publication] was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

31. Oaks even testified that whatever actions were taken against her, were taken because of the individual traits she possessed rather than the fact that she was a woman. Conduct directed at a plaintiff because of individual or personal traits rather than because of class membership, is insufficient to sustain a claim under § 1985(3). *McLellan v. Mississippi Power & Light Co.*, 526 F.2d 870, 877 (5th Cir. 1976), *modified*, 545 F.2d 919 (5th Cir. 1977); *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

Actual malice is a constitutional issue to be decided initially by the trial judge vis-a-vis motions for summary judgment and directed verdict. The functions of the trial court judge and the jury have been explained as follows:

> "In my judgment *New York Times Co. v. Sullivan* makes actual malice a constitutional issue to be decided in the first instance by the trial judge applying the *Times* test of actual knowledge or reckless disregard of the truth. Cf. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Unless the court finds, on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the *Times* sense, it should grant summary judgment for the defendant.
>
> * * * * * *
>
> *Wasserman v. Time, Inc.*, 424 F.2d 920, p. 922 (D.C.Cir.1970) (Wright, J., concurring).

*Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858, 864 (5th Cir. 1970). Indeed, the issue "lends itself to summary judgment because actual malice must be shown with 'convincing clarity,' *New York Times Co. v. Sullivan* [376 U.S. 254, 285–86, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964)]." *Southard v. Forbes, Inc.*, 588 F.2d 140, 146 (5th Cir. 1979), *cert. denied*, 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979). One appellate court has stated that the Fifth Circuit's approach to the issue of actual malice "amounts almost to a presumption in favor of summary judgment." *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 275 n.56 (3d Cir. 1980). Indeed, the Fifth Circuit recently addressed the issue of "actual malice" in the context of summary judgment and declared:

> [T]he standard of review in First Amendment defamation actions, as in all summary judgment cases, is whether the record, construed in a light most favorable to the party against whom the judgment has been entered, demonstrates there are genuine issues of fact which, if proven, would support a jury verdict for that party. Since, however, a jury verdict in a defamation case can only be supported when actual malice is shown by clear and convincing evidence, rather than by a preponderance of evidence as in most other cases, . . . the evidence and all the inferences which can reasonably be drawn from it must meet that higher standard.

*Rebozo v. Washington Post Co.*, 637 F.2d 375, 381 (5th Cir. 1981).[32]

53. District courts within this circuit and elsewhere have not hesitated to grant defendants' motion for summary judgment in defamation cases in which the complainant has failed to demonstrate the existence of any genuine issue of material fact from which a jury could find actual malice. *E. g., Ethridge v. North Miss. Communications, Inc.*, 460 F.Supp. 347, 352 (N.D.Miss.1978); *Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440, 448–49 (S.D. Ga.1976), *aff'd* 580 F.2d 859 (5th Cir. 1978); *Fram v. Yellow Cab Co. of Pittsburgh*, 380 F.Supp. 1314, 1335 (W.D.Pa.1974); *Alexander v. Lancaster*, 330 F.Supp. 341, 350 (W.D. La.1971); *Davis v. National Broadcasting Co.*, 320 F.Supp. 1070, 1073 (E.D.La.1970). Oaks has failed to adduce facts that demonstrate with "convincing clarity" actual malice in connection with either the Library Board letter or the statements attributed to the Mayor of Fairhope. On the contrary, the facts surrounding preparation of the Library Board letter as well as the diligent efforts to avoid public disclosure militate against a finding of malice.[33] No facts

**32.** Oaks suggests that this court should apply the Alabama "scintilla rule" in considering the question of actual malice on summary judgment. Both the Alabama Supreme Court and the Fifth Circuit recognize, however, that the scintilla rule is not applicable to motions for summary judgment in federal court. *Wilson v. Liberty Nat. Life Ins. Co.*, 331 So.2d 617, 619–20 (Ala.1976); *Tyler v. Insurance Co. of North America*, 539 F.2d 1072, 1074 (5th Cir. 1976).

**33.** For the purpose of summary judgment the court accepts as true that a City Councilman and the Mayor of Fairhope viewed the Library Board letter. The court need not decide whether submission of the letter to the Councilman

contradict the testimony that the statement of reasons was prepared in "fairness" to Oaks. *See* Findings of Fact ¶ 49. With regard to the statements attributed to the Mayor of Fairhope, the undisputed facts, as well as the context of the newspaper articles in which the statements appeared, establish that the mayor's statements constituted a good faith response to public statements previously made by Oaks. The record simply does not support a finding of malice requisite to overcome the constitutional privilege.

54. The court's conclusion, with respect to the alleged defamatory statements by the Mayor of Fairhope, is fortified by the existence of a "fair comment" privilege. Alabama law clothes a public official with a qualified or conditional privilege of "fair comment" in addition to the constitutional privilege regarding public figures. *Fulton v. Advertiser Co.*, 388 So.2d 533, 537 (Ala.1980). The question whether a communication is privileged as fair comment by reason of its character or by reason of the occasion of its making is a question of law for this court. *Willis v. Demopolis Nursing Home, Inc.*, 336 So.2d 1117 (Ala.1976). The Supreme Court of Alabama has acknowledged that the mayor of a municipality is afforded the conditional privilege of fair comment for his remarks in public regarding a matter of public concern. *Browning v. Birmingham News*, 348 So.2d 455, 458 (Ala.1977). Mayor Nix's comments concerning the reasons for Oaks' first discharge were clearly within the conditional privilege.

55. After the qualified privilege of fair comment has been established, just as after public figure status is determined, a person claiming defamation "must allege and prove actual or express malice in order to recover." *Fulton v. Advertiser Co.*, 388 So.2d at 537–38. One federal district court in New York addressed the operation of summary judgment in a "fair comment" case as follows:

> Defendants are entitled to summary judgment where the alleged defamation constitutes fair comment and plaintiff fails to set forth evidentiary facts, which would warrant a trial, to support the allegations the defendants were motivated by malice [citation omitted]. Summary judgment is not defeated by charges based upon surmise, conjecture and suspicion [citations omitted]; particularly where there has been full opportunity for discovery [citations omitted].
>
> The "rule" that summary judgment should be reluctantly granted where state of mind is at issue should not dissuade the court from its duty to grant such relief where no material fact issue exists [citations omitted]; the question of malice is for the jury only when evidence exists warranting that issue's submission to that body, [citations omitted]. The mere hope of putting defendants' witnesses' credibility in issue at trial is not enough to withstand a motion for summary judgment [citations omitted]. Moreover, because of the importance of free speech, summary judgment is the "rule," and not the exception, in defamation cases.

*Guitar v. Westinghouse Elec. Corp.*, 396 F.Supp. 1042, 1053 (S.D.N.Y.1975), *aff'd without opinion*, 538 F.2d 309 (2d Cir. 1976). Although the court does not necessarily agree that summary judgment "is the rule and not the exception" in this type action, the court does conclude that summary judgment is appropriate in this case.

56. Oaks' attempt to join the City of Fairhope (the municipality) in the defamation claim, is fatally defective on other grounds, as well. Apart from the technical requirements of defamation, Oaks' defamation claim against defendant City of Fairhope is barred by a statutory nonclaim provision which provides:

> All claims against the municipality (except bonds and interest coupons and

and the Mayor (both of whom were defendants in Oaks' first lawsuit) was insufficient publication as a matter of law. *See e. g., Kenney v. Gurley*, 208 Ala. 623, 95 So. 34 (1923); *McDowell v. Texas*, 465 F.2d 1342, 1344–45 (5th Cir. 1971); *Makofsy v. Cunningham*, 526 F.2d 1223, 1236 n.4 (5th Cir. 1978).

claims for damages) shall be presented to the clerk for payment within two years from the accrual of said claim or shall be barred. *Claims for damages growing out of torts shall be presented within six months from the accrual thereof or shall be barred.*

*Code of Ala.* 1975, § 11–47–23 (emphasis supplied). Although defamation is recognized as a tort in Alabama, *United States Steel Corp. v. Darby*, 516 F.2d 961, 963 (5th Cir. 1975), Oaks neither filed a claim with the city clerk of Fairhope nor brought an action within six months of the conduct upon which her defamation claim is based. Oaks' failure to timely file either a claim as required by the foregoing statute or a lawsuit means that her defamation claim is barred by the time limitations of Section 11–47–23. *See Browning v. City of Gadsden*, 359 So.2d 361, 364 (Ala.1978); *Hunnicutt v. City of Tuscaloosa*, 337 So.2d 346 (Ala.1976). Indeed, Oaks now concedes that summary judgment should be *granted* in favor of the City of Fairhope on all defamation claims (Oaks Response ¶ 57).

### Individual Defendants

57. The court made a specific finding regarding Oaks' utter failure to support *individual* claims against certain members of the City Council. To the extent that Oaks bases a damage claim under 42 U.S.C. § 1983 upon the City Council's vote on the proposed Library budget, the claim is untenable. The City Council's votes on the Library budget constituted legislative acts. "[I]f legislators of any political subdivision of a state function in a legislative capacity, they are absolutely immune from being sued under the provisions of § 1983." *Bruce v. Riddle*, 631 F.2d 272, 279 (4th Cir. 1980). *Accord, Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 614 (8th Cir. 1980); *Wells v. Hutchinson*, 499 F.Supp. 174, 185 (E.D.Texas 1980). Since the members of the City Council enjoyed absolute immunity with respect to their votes on budgetary matters, Oaks' contentions regarding the council's actions are without merit.

Based upon the foregoing Findings of Fact and Conclusions of Law, the court concludes that there is no genuine issue of a material fact and that the defendants are entitled to judgment on each claim as a matter of law.

Defendants' Motion for Summary Judgment is due to be, and the same hereby is, GRANTED.